WILLIAM P. O'MALLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; BARBARA L. O'MALLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
O'Malley v. Commissioner
Docket Nos. 8797-77; 12113-77.
United States Tax Court
T.C. Memo 1980-95; 1980 Tax Ct. Memo LEXIS 491; 40 T.C.M. (CCH) 16; T.C.M. (RIA) 80095; March 26, 1980, Filed William P. O'Malley, pro se. Roger D. Osburn, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for calendar year 1974 in the amount of $4,165.42 and an addition to tax under section 6653(a), I.R.C. 1954, [1] of $208.27. The issue with respect to the addition to tax was conceded by respondent, leaving for decision only whether a transaction involving $20,000 of advances by one of petitioners to a third party resulted in a worthless nonbusiness debt, the loss *493 from which is deductible in accordance with the provisions of section 166(d) or a loss from a transaction entered into for profit deductible under section 165(c)(2). FINDINGS OF FACT Petitioners William P. O'Malley and Barbara L. O'Malley, husband and wife, who resided in Clearwater, Florida, at the time of filing their petition in this case, filed a joint Federal income tax return for calendar year 1974 with the Internal Revenue Service Center at Chamblee, Georgia. Mrs. O'Malley was married to William P. O'Malley in December 1972. She had previously been married to Charles Robertson. Mr. Robertson died in an automobile accident in December 1969. During her marriage to Mr. Robertson and as his widow, Mrs. O'Malley had been known as Barbara L. Robertson; however all further references to her shall be by her present married name. Subsequent to Mr. Robertson's death, Mrs. O'Malley collected proceeds of $25,000 from the insurance held on Mr. Robertson's life. At that time Mrs. O'Malley was employed by the Hertz Corporation *494 in St. Petersburg, Florida. Richard A. Sharp, by marriage a relative and a friend of Mrs. O'Malley, lived in Shreveport, Louisiana, in March 1970. Mr. Sharp was president of a real estate company, Richard A. Sharp, Inc., with offices in Shreveport and Baton Rouge, Louisiana. As a result of discussions between Mr. Sharp and Mrs. O'Malley, Mrs. O'Malley advanced $2,000 to Mr. Sharp on March 2, 1970. Mrs. O'Malley understood that the $2,000 would be used by Mr. Sharp in developing a proposed residential subdivision in Caddo Parish, Louisiana, on property which he had inherited from his father. At that time Mrs. O'Malley did not receive from Mr. Sharp and written receipt or memorandum acknowledging the $2,000 advance. However, on May 20, 1970, Mrs. O'Malley accepted from Mr. Sharp a writing acknowledging his receipt of the $2,000 advance. Dated March 2, 1970, the acknowledgement provides: This will acknowledge receipt in the amount of $2,000.00, from Mrs. Barbara L. Robertson, 2401 S. Shore Dr., S.E., St. Petersburg, Florida, such funds being credited to the account of Mrs. Robertson as her interest in the proposed Cross Lake West-Sharp Estate development by RICHARD A. SHARP, *495 INC., or one of its wholly owned subsidiaries, for which RICHARD A. SHARP, INC., promises to pay directly to Mrs. Barbara L. Robertson, the amount of $150.00 per lot, as sold, on lots 1A through lots 20A, as proposed, until Mrs. Robertson has received a full and final amount of $3,000.00, in return for the $2,000.00 invested. It is fully understood by Mrs. Barbara L. Robertson and by Richard A. Sharp, President of RICHARD A. SHARP, INC., that this transaction is of a personal nature and personally guaranteed by Richard A. Sharp or, in the event of his death, by his Estate, and in no way involves the sale of stock; it being further agreed by Richard A. Sharp, President and sole owner of Richard A. Sharp, Inc., and its wholly owned subsidiaries, that for any reason the proposed development does not materialize within twelve months of this date, Mrs. Barbara L. Robertson will be refunded the above mentioned $2,000.00, bearing interest at the rate of 10% per annum, effective this date. Between March 1970 and November 1970 Mrs. O'Malley advanced $18,000 in several installments to Mr. Sharp. Mr. Sharp responded by later acknowledging the first installment of $5,000 by a promissory *496 note dated June 6, 1970, which provides: I, RICHARD A. SHARP, 4501 Orchid Street, Shreveport, Louisiana, promise to pay to the order of Mrs. Barbara L. Robertson, St. Petersburg, Florida, the amount of Five Thousand and no/100 Dollars ($5,000.00), upon request of thirty (30) days written notice, with interest at the rate of Ten (10) per cent per annum from June 6, 1970, until paid. The second installment, $3,000, is evidenced by a promissory note dated July 6, 1970, signed in Shreveport, Louisiana, by Mr. Sharp, providing as follows: I, RICHARD A. SHARP, promise to pay to the order of Mrs. Barbara L. Robertson, St. Petersburg, Florida, the amount of Three Thousand and no/100 Dollars ($3,000.00), upon request of thirty (30) days written notice, with interest at the rate of Ten (10) per cent per annum from July 6, 1970, until paid. Mr. Sharp acknowledged the fourth and final installment of $10,000 with a similar note executed on November 2, 1970, and bearing interest of 10 percent per annum from date of execution. All three promissory notes were forwarded to Mrs. O'Malley along with a letter dated November 2, 1970. Aside from a reference to *497 the three notes, Mr. Sharp's only mention of business in that correspondence is as follows: It appears I may go to Washington around the 13th or 14th. I am trying to secure an appointment with Gillis Long. Gillis is quite a prominent attorney in Washington and has vast experience with setting up stock issues and gaining the approval of the Securities and Exchange Commission. It may be a little premature but it is a very time consuming undertaking and won't hurt for me to be familiarizing myself with the red tape necessary, as well as the expense involved. It also appears Gillis may be the next Governor of Louisiana and nothing like getting your foot in the door. Unfortunately in Louisiana, it isn't WHAT you know but WHO you know. Between the spring of 1970 and March 28, 1971, Mrs. O'Malley and Mr. Sharp had several telephone conversations. During those discussions Mr. Sharp encouraged Mrs. O'Malley to leave her funds in his possession. On March 28, 1971, Mr. Sharp wrote a letter to Mrs. O'Malley wherein he states: Anyhow, to let you know that you have not invested money in vain and that I still have your best interests at heart, and be advised that you and Jean will receive *498 interest due to the delay, I have had many soul searching decisions to make and think I have finally made them to the betterment of the entire project. I really will have to see you and talk with you to tell you of the problems that have confronted me, but I believe they are all behind us now. The first filing on the subdivision, to be known as Richland Hills, is now a matter of record, property has been dedicated to the parish for roads, the surveyors finished staking the lots this past week, I have received the bids on roads, gas lines, water, lights, clearing, etc., to the turn of $29,000.00. Anyhow, it is going to go great guns, and many other things which I haven't told you about, but am involved in and all of it together should make the two of us pretty well secure in our old age, and believe you me, mine has crept up on a big hurry. * * *
And, what else? Oh, yes. I am recapitalizing Richard A. Sharp, Inc., to bring out a half million dollar stock issue.Primarily its function will be to have the funds to promote about eight of these similar projects at one time throughout the country. At an estimated profit of about $200,000 each during a six month period, that *499 is a very lucrative venture. So, start talking up the stock. The attorneys are fixing it so you will subscribe for about $100,000 worth of stock but you will pay for it only out of declared dividends from profits. So, you'll wind up owning that much without paying for it out of your pocket. In other words, you'll have that much stock reserved for you, and each time a dividend is declared, you will use that money to purchase so much stock until you get your $100,000 worth and yet, not a dime of your own money has gone into it. * * * On January 23, 1972, the Richland Hills Subdivision, to which Mr. Sharp had referred in his March 28, 1971, correspondence, remained undeveloped. At that time Mr. Sharp wrote a letter to Mrs. O'Malley wherein he refers to her $20,000 advances in connection with ownership in that proposed development project: This is to acknowledge that for the amount of twenty-five thousand dollars ($25,000.00), of which I acknowledge receipt of twenty thousand dollars ($20,000.00), you are the rightful owner of a one-quarter (1/4) interest in Richland Hills Subdivision, Caddo Parish, Louisiana. Richland Hills Subdivision, to comprise an area slightly *500 more or less than one hundred (100) acres, is located in the SW1/4 of Section 23, T18N, R16W, Caddo Parish, Louisiana. For any reason whatsoever that I, Richard A. Sharp, Record Owner, dedice not to fully develop Richland Hills as a subdivision as planned, I hereby agree to return the above mentioned funds to you, bearing interest at the rate of ten per cent (10%) per annum. Following Mrs. O'Malley's marriage to William P. O'Malley in December 1972, she made several inquiries of Mr. Sharp with regard to the progress of the development of his subdivision. In February 1974, Mr. and Mrs. O'Malley traveled to Shreveport, Louisiana, to visit Mr. Sharp. Petitioners visited the future site of Richland Hills Subdivision and found that contrary to Mr. Sharp's reports neither roads nor drainage pipes had been laid. Petitioners hired a Louisiana attorney, Alfred W. Bullock, to accompany them to the Office of Public Records of Caddo Parish, where they found that Mr. Sharp had encumbered the Richland Hills Subdivision tract with a $50,000 mortgage. Thereafter, on behalf of petitioners Mr. Bullock prepared a second mortgage covering the Richland Hills Subdivision. Mr. Sharp, as mortgagor, *501 executed the $26,098.55 mortgage on July 19, 1971, in favor of "Future Holder," as mortgagee. The $26,098.55 demand note accompanying the mortgage was executed by Mr. Sharp on July 19, 1974; however, by its terms the 10 percent per annum interest was to accrue from May 29, 1974. In the latter part of 1974 Mr. Bullock determined that Mr. Sharp had defaulted on the first mortgage of $50,000 encumbering the Shreveport property. On December 23, 1974, Mr. Bullock wrote Mr. O'Malley that Peoples Bank and Trust Company of Minden, Louisiana, had filed foreclosure proceedings. Meanwhile, Mr. Sharp had left the country and reputedly had relocated in Honduras. Mr. Sharp never returned to Mrs. O'Malley any of her $20,000 advances, nor did he pay any interest thereon. In their 1974 income tax return petitioners claimed an ordinary loss of $20,000 from "investment in land development." Respondent disallowed petitioners' claimed loss of $20,000 and determined that the $20,000 loss was from a nonbusiness bad debt. On this basis respondent determined that petitioners were entitled to deduct in 1974 the amount of $1,000 since their nonbusiness bad debt must be treated as a short-term capital *502 loss. OPINION Petitioners content that the $20,000 advanced between March 2, 1970, and November 2, 1970, by Mrs. O'Malley to Mr. Sharp constitute transactions entered into for profit and that the worthlessness of those advances in 1974 entitled them to an ordinary loss deduction under section 165(c)(2). [2] Respondent takes the position that the advances made by Mrs. O'Malley to Mr. Sharp were loans which became worthless in 1974 and that petitioners are entitled only to deduct $1,000 for a nonbusiness bad debt in accordance with the provisions of section 166. [3] As each party recognizes, the treatment provided under the loss and bad debt provisions of the Code are mutually exclusive. Spring City Foundry Co. v. Commissioner, 292 U.S. 182 (1934). *503 This Court and other courts have construed the phrase "any transaction entered into for profit" though not connected with a trade or business as found in section 165(c)(2) to refer to "all transactions induced primarily by a profit motive." Jefferson v. Commissioner, 50 T.C. 963, 968 (1968). The controlling factor in determining whether a transaction is "induced primarily by a profit motive" is the taxpayer's intent or state of mind when engaging in the transaction. A bad debt results where there has been (1) previous creation of a creditor-debtor relationship, i.e., a valid debt; and (2) occurrence of the debt's worthlessness in the tax year in issue. Prior to 1942, there was no distinction between business and nonbusiness bad debts. In enacting the predecessor or section 166(d) Congress rejected the liberal treatment previously given to deductions for nonbusiness bad debts and intended "to put nonbusiness investments in the form of loans on a footing with other nonbusiness investments" by treating their worthlessness as short-term capital loss. Putnam v. Commissioner, 352 U.S. 82, 92 (1956). *504 With regard to bad debt deductions H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 372, 408-409, stated: The present law gives the same tax treatment to bad debts incurred in nonbusiness transactions as it allows to business bad debts. * * * This liberal allowance for nonbusiness bad debts has suffered considerable abuse through taxpayers making loans which they do not expect to be repaid.This practice is particularly prevalent in the case of loans to persons with respect to whom the taxpayer is not entitled to a credit for dependents. * * * For purposes of section 166 the courts have defined debt as an unqualified obligation to pay a sum certain. E.g., Gilbert v. Commissioner, 248 F.2d 399 (2d Cir. 1957), remanding a Memorandum Opinion of this Court. The existence of a contingency repayment precludes the formation of a loan within the meaning of section 166. Between March 2, 1970, and November 2, 1970, Mrs. O'Malley advanced to Mr. Sharp, a friend and a relative by a prior marriage, a total of $20,000, in installments as follows: $2,000 on or before March 2, $5,000 on or before June 6, $3,000 on or before July 6, and $10,000 *505 on or before November 2. Petitioners assert that the advances were given to Mr. Sharp for investment purposes. By petitioners' account the funds were to be used in developing a subdivision in Caddo Parish, Louisiana, and Mrs. O'Malley was to receive an interest in the subdivision in return for her advances.Respondent contends that Mrs. O'Malley and Mr. Sharp were not joint venturers, and therefore that the transaction was not entered into for profit within the meaning of section 165. Petitioners do not claim that Mrs. O'Malley entered into a joint venture. Instead, they insist that a transaction entered into for profit as referred to in section 165(c)(2) is not limited to transactions between joint venturers, relying on Weir v. Commissioner, 109 F.2d 996 (3d Cir. 1940), affirming in part and reversing in part 39 B.T.A. 400 (1939) (where loss was deductible on a transaction involving the purchase and sale of preferred stock of a corporation which owned the taxpayer's apartment building); Jefferson v. Commissioner, 50 T.C. 963 (1968) (where taxpayer purchased mother's home). Section 165(c)(2) and section 1.165-1(e)(2) refer to *506 any transaction entered into for profit. Petitioners do not attach a label to the type of transaction in which Mrs. O'Malley engaged. Rather, petitioners view the advances as being covered by the term "any transaction." As we indicated in Seed v. Commissioner, 52 T.C. 880, 885 (1969)-- With respect to the meaning of the word "transaction," apparently the only discussion concerning its meaning is contained in comments made during the debate in the U.S. Senate to the effect that the word was "a very broad word" and that the word "by itself means anything." 53 Cong. Rec. 13265 (1916). It is obvious, however, that Congress intended to grant a deduction for a loss which arose out of activities which constituted something less than the carrying on of a trade or business. To hold otherwise would be to render section 165(c)(2) a nullity since losses incurred in a trade or business are deductible under section 165(c)(1). We will not assume that congress did a useless thing, Mercantile National Bank v. Langdeau,371 U.S. 555 (1963). Accordingly it was appropriate to note in Eli D. Goodstein,30 T.C. 1178, 1192 (1958), affd. *507 267 F.2d 127 (C.A. 1, 1959), that "It is clear that the type of transaction to which the statute refers is one which has substance and in which there is a true motive of deriving a profit." (Emphasis supplied.) * * * Certainly where a taxpayer lends his money to another person for the borrower's use, the creditor intends to realize a profitable return from the borrower. However, it is clear that the term "any transaction entered into for profit" as used in section 165(c)(2) was not intended to and does not include a loan even though the taxpayer expects a profit in the nature of interest for the use of his money. See Putnam v. Commissioner,352 U.S. 82, 88 (1956), in which the Court pointed our that "the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Therefore, if we conclude that Mrs. O'Malley's advances to Mr. Sharp were loans which became worthless in 1974, it follows that the deduction to which petitioners are entitled is governed by sectioin 166(d) even though Mrs. O'Malley's objective was to receive *508 interest from the $20,000 advances to her friend, Mr. Sharp. On the basis of the facts in this record, we conclude that Mrs. O'Malley intended to and did make loans of the $20,000 to Mr. Sharp, and any thought she had of investment in a profitable real estate venture was merely a potential bonus. In taking the position that Mrs. O'Malley did not lend any money to Mr. Sharp, petitioners argue that all written documents acknowledging the advances are merely unsolicited receipts executed by Mr. Sharp.The correspondence between Mrs. O'Malley and Mr. Sharp indicates the contrary. Each written acknowledgement signed by Mr. Sharp consists of an unconditional promissory note payable on demand to Mrs. O'Malley at the rate of interest of 10 percent per annum. The characterization by petitioners of these notes as unsolicited does not negate the existence of a creditor-debtor relation-ship between Mrs. O'Malley and Mr. Sharp.Petitioners further claim that Mr. sharp's and Mrs. O'Malley's treatment of their relationship disfavors characterization as that of a creditor and debtor. As supporting their conclusion petitioners cite the fact that Mr. Sharp delayed written acknowledgements of the *509 June and July advances, for $5,000 and $3,000, respectively, until November 2, 1970. They claim that a true creditor would not have tolerated the time lapses. Yet, we are unpersuaded by this assertion as their personal friendship and Mrs. O'Malley's trust of Mr. Sharp explain the reason for Mrs. O'Malley's failure to complain of the delays. Petitioners emphasize that the March 2, 1970, receipt acknowledging the $2,000 advance from Mrs. O'Malley to Mr. Sharp referred to the funds as being credited toward a future interest in a proposed real estate development.According to the receipt, in return for the $2,000 advance, Mrs. O'Malley could receive $150 per lot, as sold, on 20 proposed lots, until paid a total of $3,000. Petitioners are reading the first paragraph of the acknowledgement in isolation. Instead, when all paragraphs of the March 2, 1970, acknowledgement are read as a complete unit, the language does not contravene our conclusion. It is clear from the record that the parties perceived the proposed real estate development as tenuous. Mr. Sharp personally and unconditionally guaranteed Mrs. O'Malley that after one year her $2,000 advance would be refunded on demand with *510 interest at a rate of 10 percent per annum. Between March 2, 1970, and March 2, 1971, the funds were at Mr. Sharp's disposal and available for any purpose, personal or otherwise. If the real estate development materialized according to Mr. Sharp's definition, within that first year, Mr. Sharp promised to apply the $2,000 thereto. In that event, the guaranteed loan bearing 10 percent interest annually effectively would be transformed into one bearing total interest of 50 percent regardless of the number of years required to reach that yield. In essence the claim of $2,000 plus total interest of 50 percent was conditional; the $2,000 demand note bearing 10 percent per annum interest was an unconditional debt. To further support their position, petitioners rely on letters dated November 2, 1970, and March 28, 1971, to indicate that the $20,000 in advances to Mr. Sharp were investment transactions.The November 2, 1970, correspondence does not so indicate.In fact, that letter refers to three promissory notes executed by Mr. Sharp in favor of Mrs. O'Malley, dated June 6, 1970, July 6, 1970, and November 2, 1970. In the November 2, 1970, correspondence Mr. Sharp writes that he may *511 travel to Washington to secure an appointment with Gillis Long, an attorney with experience in "gaining the approval of the Securities and Exchange Commission" in the issuance of stock. Petitioners would have us believe that the reference to traveling to Washington was for the purpose of Mr. Sharp's establishing a half-million dollar corporation in which he could invest Mrs. O'Malley's advances. The language of the November 2, 1970, writing and Mrs. O'Malley's testimony do not support petitioners' claim. The fact that Mr. Sharp executed an unconditional demand note in the amount of $10,000 bearing interest at a rate of 10 percent per annum from November 2, 1970, clearly indicates that when Mrs. O'Malley advanced the $10,000 to Mr. Sharp, she intended it as a personal loan to Mr. Sharp. Certainly Mrs. O'Malley did not intend the advances to remain financially unproductive prior to the formation of the proposed corporation. Supportive of this conclusion is Mrs. O'Malley's own testimony that "then he got this brainchild of going in and doing this stock thing, and this is the new -- a whole new deal, than what our original was." Alternatively, petitioners argue that the March 28, 1971, correspondence *512 justifies an ordinary loss deduction. They claim that the letter is merely a written indication of prior oral conversations between Mrs. O'Malley and Mr. Sharp. Their contention is that Mrs. O'Malley and Mr. Sharp entered into a novation between mid-1970 and spring 1972 whereby Mrs. O'Malley's advances to Mr. Sharp would constitute a "pre-paid, presubscription agreement" for stock. We do not agree with petitioners' position with respect to a "novation." However, if Mrs. O'Malley's advances were a "pre-paid, presubscription agreement" for stock, petitioners would not be entitled to any greater deduction than the $1,000 allowed by respondent. Under sections 165(f) and (g) and Income Tax Regulation section 1.165-5(a)(2) and section 1.165-5(c), worthless securities, including "a right to subscribe for, or to receive, a share of stock in a corporation" are treated as a capital loss as limited by sections 1211 and 1212. See also Gawler v. Commissioner,60 T.C. 647 (1973), affd. 504 F.2d 425 (4th Cir. 1974). In our view, however, no such *513 "pre-paid presubscription agreement" ever existed. We hold that Mrs. O'Malley made loans of $20,000 to Mr. Sharp and that when this debt became worthless in 1974 petitioners became entitled to a $1,000 deduction under section 166(d) for a nonbusiness bad debt.
Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue.↩
2. Section 165(c) reads in pertinent part as follows: SEC. 165. LOSSES. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * ↩
3. As applicable, section 166 reads in part as follows: SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts.--When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting thereform shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months.↩