SUNDSTRAND CORPORATION AND CONSOLIDATED SUBSIDIARIES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sundstrand Corp. v. Commissioner
Docket No. 27220-89
United States Tax Court
T.C. Memo 1992-86; 1992 Tax Ct. Memo LEXIS 91; 63 T.C.M. (CCH) 2043; T.C.M. (RIA) 92086; February 11, 1992, Filed *91 John C. Klotsche, Bertrand M. Harding, Jr., Robert H. Albaral, James M. O'Brien, Mark A. Oates, and Neil D. Traubenberg, for petitioners. Reid M. Huey, Joseph P. Grant, and Sherri L. Feuer, for respondent. HAMBLEN
HAMBLEN
MEMORANDUM OPINION HAMBLEN, Judge: Respondent determined the following deficiencies in petitioners' income tax returns for 1979 and 1980 (hereinafter sometimes referred to as the years in controversy): Year
Amount of Deficiency
1979
$ 13,674,981
1980
28,541,936
Respondent also determined that petitioners are liable for increased interest under section 6621(c), [1] formerly section 6621(d), on the basis that the deficiencies attributable to the section 482 issue constituted substantial underpayments attributable to a tax-motivated transaction. *92 This matter is before the Court on petitioners' motion for partial summary judgment filed pursuant to Rule 121. The issue which petitioners seek to have adjudicated is whether, as a matter of law, for the 1979 and 1980 years, respondent is collaterally estopped from relitigating the issues decided by the Court in Sundstrand Corp. v. Commissioner, 96 T.C. 226 (1991) (hereinafter sometimes referred to as Sundstrand I). Summary judgment is appropriate if the pleadings and other materials show that there is no genuine issue as to any material fact and a decision may be rendered as a matter of law. Rule 121(b); Naftel v. Commissioner, 85 T.C. 527, 529 (1985). A partial summary adjudication may be made which does not dispose of all the issues in the case. Rule 121(b). The nonmoving party cannot rest upon the allegations or denials in his pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Rule 121(d); Dahlstrom v. Commissioner, 85 T.C. 812, 820-821 (1985). The moving party, however, bears the burden of proving that no genuine issue exists as to any material fact and that he is *93 entitled to judgment on the substantive issues as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Espinoza v. Commissioner, 78 T.C. 412, 416 (1982). In deciding whether to grant summary judgment, we view the factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Naftel v. Commissioner, supra at 529. If there exists any reasonable doubt as to the facts at issue, the motion must be denied. Espinoza v. Commissioner, supra at 416. We assume the facts described below on the basis of the pleadings and other pertinent materials in the record. Rule 121(b). They are stated solely for purposes of deciding the motion for partial summary judgment, however, and are not findings of fact for this case. Fed. R. Civ. P. 52(a). Background
The primary issue in the instant case involves respondent's allocation of income under section 482 relating to certain intercompany transactions between Sundstrand Corporation (hereinafter petitioner) and its wholly owned *94 Singapore subsidiary, Sundstrand Pacific (Pte.) Ltd. (hereinafter referred to as SunPac), for the years in controversy. In Sundstrand I the Court decided this same section 482 issue with respect to petitioners' 1977 and 1978 years. For 1979 and 1980, pursuant to section 482, respondent increased petitioners' gross income attributable to transactions between petitioner and SunPac in the following amounts: Year
Increase in income
1979
$ 18,931,671
1980
30,924,116
Respondent also made certain correlative adjustments to petitioners' income as a result of the section 482 adjustment, including adjusting the foreign tax credits or deemed foreign tax credits petitioners claimed on their tax returns for the years in controversy. Petitioner is a manufacturer of major subsystems, including the constant speed drive (CSD), for commercial and military aircraft. Substantially all commercial and military jet aircraft flown during the 1970s used petitioner's CSD. In mid-1970, SunPac began to manufacture CSD spare parts in Singapore for sale to commercial airlines (SunPac parts). For a complete description of the CSD and SunPac's operations relating to that avionic device, see Sundstrand Corp. v. Commissioner, supra at 235-238, 252-255. *95 Throughout 1979 and 1980, SunPac's operations continued to involve the manufacture and sale of SunPac parts for use on commercial aircraft. SunPac continued to have the right to sell SunPac parts throughout the world to unrelated parties. During 1979 and 1980 SunPac sold SunPac parts to petitioner, Societe Anonyme Belge D'Exploitation de la Navigation Aerienne (SABENA), and various Asian airlines. Petitioner and SunPac entered into a Technical Assistance and License Agreement (the SunPac License) on July 15, 1975. The SunPac License gave SunPac an exclusive right to manufacture in Singapore, and a nonexclusive right to sell worldwide, specific commercial SunPac parts. Under the SunPac License, SunPac acquired the right to use the intangible property petitioner transferred to it in order for SunPac to manufacture the SunPac parts. Petitioner agreed to provide technical assistance to SunPac relating to its manufacture of the SunPac parts. The term of the SunPac License was 12 years, with an automatic 5-year renewal period. The SunPac License provided that SunPac would pay petitioner a royalty fee of 2 percent of the net selling price of each CSD manufactured and sold by SunPac *96 for the rights acquired and any technical assistance rendered to it by petitioner. During 1977 and 1978, the SunPac License was amended on 11 occasions [2] to either transfer proprietary manufacturing data to SunPac to enable it to manufacture additional parts or update the total technical assistance costs incurred by petitioner to assist SunPac. Petitioner and SunPac further amended the SunPac License on May 1, 1979 (Amendment No. 11), but effective retroactively for sales on or after July 1, 1977, to provide that SunPac would pay petitioner, in addition to the 2 percent royalty fee: (1) A fee of 1.1 percent of the net selling price of each SunPac part sold for any assistance petitioner rendered to SunPac outside of Singapore (offshore assistance) until the total offshore assistance costs were paid, plus (2) a fee of 1.9 percent of the net selling price of each SunPac part sold for any assistance petitioner rendered to SunPac in Singapore (onshore assistance) until the total onshore assistance costs were paid. For a complete description of the SunPac License and Amendments Nos. 1 through 11, see Sundstrand Corp. v. Commissioner, 96 T.C. at 264-266. Amendment *97 No. 12, which was executed before Amendment No. 11, was not introduced into the record for the earlier case. On April 14, 1976, petitioner and SunPac entered into a Distributor Agreement (the Distributor Agreement) that appointed petitioner as a nonexclusive, worldwide distributor of SunPac parts. Either party could terminate the Distributor Agreement upon 30 days' notice. Under the Distributor Agreement, SunPac agreed to sell to petitioner SunPac parts at the prices set forth in a separate attachment to the Distributor Agreement. SunPac was not guaranteed a specific transfer price for sales of its products to petitioner under the Distributor Agreement, nor did petitioner guarantee that it would purchase all of SunPac's output. During 1977 and 1978, the Distributor Agreement was amended 11 times to reflect part number changes and additions and/or changes in prices. During 1979 and 1980, the SunPac License and Distributor Agreement, as *98 amended from time to time, remained in force. In addition to Amendment No. 11, which revised the payment fee arrangement, the SunPac License was amended on seven different occasions during 1979 and 1980 to either (1) add new SunPac parts for SunPac to manufacture or (2) reflect petitioner's total assistance costs incurred to date. The Distributor Agreement also was amended seven times during these two years to reflect part number changes and additions, and/or changes in prices. During 1979 and 1980, petitioner resold SunPac parts to airline customers, used them in its overhaul and repair activities, used them in the manufacture of subassemblies which it sold as spare parts, or used them in the manufacture of original equipment manufacturer units (OEM) and spare units. Discussion
In an amended petition for the 1979 and 1980 years, [3] filed on April 24, 1991, petitioners assert as an affirmative defense that respondent should be collaterally estopped from relitigating the section 482 issues actually and fully litigated and decided by this Court in Sundstrand Corp. v. Commissioner, 96 T.C. 226 (1991). *99 Collateral estoppel is an affirmative defense which must be raised in a party's pleading. Rule 39. An affirmative defense not pleaded is deemed waived. Gustafson v. Commissioner, 97 T.C. 85, 90 (1991); Jefferson v. Commissioner, 50 T.C. 963, 966-967 (1968). Under the doctrine of collateral estoppel, a judgment in a prior suit precludes litigation, in a second cause of action, of issues actually litigated and necessary to the outcome of the first action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). Collateral estoppel applies to issues of fact or law previously litigated. Meier v. Commissioner, 91 T.C. 273, 283-286 (1988). In Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990), this Court set forth the following five conditions to determine whether collateral estoppel was appropriate: 1. The issue in the second suit must be identical to the one decided in the first suit; 2. there must be a final judgment rendered by a court of competent jurisdiction; 3. collateral estoppel may be invoked against parties *100 and their privies to the prior judgment; 4. the parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision; and 5. the controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. Collateral estoppel, furthermore, cannot apply if the party against whom it is asserted has not had a fair and full opportunity to litigate the issue for which the doctrine is being asserted in the earlier proceeding. Meier v. Commissioner, supra at 286. See also Montana v. United States, 440 U.S. 147, 154-155 (1979) (the applicability of collateral estoppel to an issue actually and necessarily determined in an earlier action depends on whether the issues presented by the later litigation are in substance the same as those resolved in the earlier action, whether controlling facts or legal principles have changed significantly since the earlier action, and whether other special circumstances warrant an exception to the normal rules of preclusion). The parties do not dispute that the first three elements set forth in Peck v. Commissioner, supra, *101 have been satisfied. They do not agree, however, that the remaining two elements have been met. In Sundstrand I the Court decided the following litigated issues of fact and law relative to the intercompany transactions between petitioner and SunPac: 1. Respondent's income allocations under section 482 were arbitrary, capricious, and unreasonable because they were premised on the erroneous characterization of SunPac as a subcontractor of petitioner; 2. the prices and royalty rate established by petitioner and SunPac under the Distributor Agreement and SunPac License were not arm's length; 3. the catalog price less a 20-percent discount, with SunPac bearing the entire cost of completing unfinished, reworked, and rejected parts, was the proper arm's-length transfer price for completed SunPac CSD parts sold to petitioner under the Distributor Agreement; 4. a royalty of 10 percent of the net selling price of the SunPac parts sold was the proper arm's-length royalty under the SunPac License for the intangible property SunPac acquired from petitioner; and 5. the actual cost incurred by petitioner in rendering technical assistance to SunPac was the proper arm's-length charge for *102 that assistance. Petitioner claims that each of these issues was necessarily decided in Sundstrand I and, thus, are proper issues for the application of collateral estoppel in the instant case. Respondent does not agree that collateral estoppel is appropriate for the instant case. Respondent states unequivocally that he does not intend to rely on the theory argued in Sundstrand I that income must be reallocated from SunPac to petitioner to reflect SunPac's activities as, in substance, a contract manufacturer for petitioner. He also will not assert that the License Agreement and Distributor Agreement did not have independent significance. Respondent is correct in not asserting these theories as they have been adjudicated in Sundstrand I and may not be relitigated here. Consequently, these questions are not at issue in the instant case. Respondent contends, however, that a material change in controlling facts and issues in the instant case precludes the application of collateral estoppel. In addition, respondent contends that new evidence not presented previously in Sundstrand I presents the type of special considerations justifying an exception to the usual rules of preclusion. *103 Montana v. United States, supra at 156. Respondent, furthermore, argues that there are material facts necessary to a decision in the instant case which remain in dispute. A. Special Considerations
According to respondent, collateral estoppel should not apply here because petitioner's failure to cooperate during the examination of the later years' tax returns hindered the examination of those years and because respondent discovered certain crucial evidence after the trial in Sundstrand I. We do not agree that collateral estoppel is inappropriate here. 1. Failure to Cooperate During the Examination
Respondent alleges that during the course of his examination of the 1979 and 1980 years, petitioner refused to provide certain information to the revenue agents. Consequently, respondent argues, petitioner hindered respondent's examination and his current knowledge of the facts concerning the section 482 issue. Respondent, thus, contends that he should not be collaterally estopped from litigating issues in the later years decided in the earlier case because petitioner refused to cooperate during the examination of the later years' returns. We *104 do not agree. At some point in the examination of the later years' returns, petitioner refused to furnish information for those years to respondent's agents, asserting counsel's advice based on the Sundstrand I pending trial. We find those actions inexcusable. See Ash v. Commissioner, 96 T.C. 459 (1991). Nonetheless, respondent had legal remedies available to him (e.g., administrative summons) to seek that information but chose not to pursue them. Respondent's lack of information, therefore, is as much the result of his own failure to use the tools available to him as it is petitioner's continual refusal to furnish the requested information. Respondent does not contend that petitioner's failure to cooperate during the examination stage prevented respondent from discovering facts which would show a substantial change in the controlling facts from the earlier years. Consequently, we do not find petitioner's lack of cooperation during the examination stage in itself to be a special circumstance contemplated in Montana v. United states, supra, which would require the denial of collateral estoppel. 2. Discovery of Amendment No. 12 and Raufoss Agreements
*105 Respondent also claims that he was unaware of the existence of Amendment No. 12 to the SunPac License and of petitioner's agreements with A/S Raufoss Ammunisjonfabrikker (Raufoss) [4] at the time Sundstrand I was tried and briefed. According to respondent, "Amendment No. 12 dramatically increased the CSD parts transferred to SunPac." Respondent further alleges that "The Sundstrand-Raufoss transactions present the very essence of the information which the Court required for arriving at a transfer price for SunPac parts utilized by Sundstrand in its internal production activities." Respondent argues that the discovery of Amendment No. 12 and the Raufoss agreements presents "special circumstances" which precludes the application of collateral estoppel here. We do not agree. *106 Petitioner has shown through supporting documents that it furnished Amendment No. 12 to respondent's agents during the examination of the earlier years. The Raufoss agreements apparently were missed by respondent during the earlier trial because the focus of discovery was on CSD models which could contain CSD parts manufactured by SunPac during 1977 and 1978. The parts ultimately produced by Raufoss did not meet that criteria. Thus, respondent's contention that petitioner purposefully concealed Amendment No. 12 and the Raufoss agreements from him is groundless. The application of collateral estoppel is not precluded merely because a party (respondent in Sundstrand I) failed to produce all the evidence the first time. Calcutt v. Commissioner, 91 T.C. 14, 25 (1988). Both Amendment No. 12 and the Raufoss agreements were available to respondent at the time the earlier years were tried. Consequently, respondent's contention that their discovery after the trial justifies the denial of collateral estoppel is without merit. B. Royalty Issue
Petitioner contends that, with respect to the royalty rate, the essential or controlling facts for 1979 and 1980 *107 are the same as those in existence at the inception of the SunPac License which the Court determined in Sundstrand I. Consequently, petitioner argues that both parties should be collaterally estopped from asserting as an arm's-length royalty any rate above or below the 10 percent rate the Court determined in Sundstrand I. Respondent argues, on the other hand, that the form of the transactions and the underlying purposes on which the Court determined the transfer price and royalty rate in Sundstrand I changed dramatically in 1979 and 1980; therefore, the controlling facts differ here from those in Sundstrand I. As for the royalty rate, respondent contends that through the end of 1980, petitioner transferred substantial additional intangible property (including technical engineering, manufacturing know-how, and marketing rights) comprising a 62-percent increase in part numbers through the end of 1980. Respondent also argues that, for 1979 and 1980, there were alternative sources (e.g., Raufoss) from which petitioner could have obtained CSD parts. According to respondent, after 1978 petitioner effectively "renegotiated" the SunPac License royalty provisions in Amendment No. 11, which *108 increased the royalty fee by requiring SunPac to compensate petitioner separately for technical assistance. In addition, Amendments Nos. 12 through 20 transferred substantial additional property to SunPac. Respondent contends that Amendment Nos. 11 through 20 constituted a substantial change in the rights and obligations under the SunPac License. Respondent argues that these amendments changed the controlling facts underlying the Court's determination of the arm's-length royalty rate for the earlier years. We do not agree. In Sundstrand I we found that: In order to maximize profitability, by increasing technology and its investment in phases, petitioner planned to introduce gradually families of parts at SunPac, thereby progressing from parts with the lowest to the highest technology. * * * [96 T.C. at 245.]
Thus, inherent in our determination as to an appropriate arm's-length consideration for the intangibles was the recognition that the royalty rate would encompass a growing number of CSD parts. Therefore, we do not consider Amendments Nos. 12 through 20 to be material changes in fact which would affect the royalty rate determination. As for Amendment *109 No. 11, the changes to the SunPac License pertain to the addition of a separately stated rate of compensation for the technical assistance petitioner gave SunPac, not to the basic royalty rate for the intangible property, which remained at 2 percent. In Sundstrand I we held that in an arm's-length transaction, petitioner would have demanded to be compensated separately for the technical assistance it gave SunPac. Thus, we determined that, for 1977 and 1978, the cost of that technical assistance had to be reallocated to petitioner under section 482 to clearly reflect income. Sundstrand Corp. v. Commissioner, 96 T.C. at 397. In Sundstrand I, we separated our determination as to the arm's-length consideration for the intangible property from our determination as to the arm's-length charge for technical assistance. (See below for our determination as to the applicability of collateral estoppel relating to technical assistance.) As for the royalty rate, in Sundstrand I we determined that 2 percent was not a reasonable royalty rate for the intangible property petitioner transferred to SunPac. We looked to the facts in existence at the time the SunPac License was *110 entered into, based on the record developed at the trial in Sundstrand I, to determine that a royalty of 10 percent of the net selling price of the SunPac parts sold was a reasonable arm's-length consideration for the intangible property involved. Sundstrand Corp. v. Commissioner, 96 T.C. at 378-395. This property included the industrial property rights for the SunPac parts expected to be introduced in the future as part of the gradual phasing in of SunPac production. Respondent has failed to relate any facts in his opposition to petitioner's motion for partial summary judgment which show that the controlling facts for the 1979 and 1980 years relating to the arm's-length compensation for this intangible property differ from the facts we found in Sundstrand I. Consequently, we hold that the parties are collaterally estopped from asserting as an arm's-length royalty for 1979 and 1980 any rate above or below 10 percent. C. Pricing Issue
Petitioner contends that the parties in this case should be bound by our determination in Sundstrand I that the catalog price less a 20-percent discount, with SunPac bearing the entire cost of completing unfinished, reworked, *111 and rejected parts, was the proper arm's-length transfer price for completed SunPac CSD parts sold to petitioner under the Distributor Agreement. According to petitioner, the controlling facts relating to the Distributor Agreement are the same as in existence for the earlier years. Respondent does not agree that the controlling facts are the same. He argues that the Distributor Agreement, by its very terms, was a dynamic instrument which was to be changed as the parties pricing experience dictated. We agree with respondent. As we observed in Sundstrand I: %
Petitioner did not specify in the distributor agreement that the transfer price would be catalog price less a 15-percent discount to permit revisions, up or down, in the pricing should its experience under the agreement show that an adjustment in price was warranted. [96 T.C. at 272.]
Thus, when it executed the Distributor Agreement, petitioner fully intended and expected the transfer price for SunPac parts to fluctuate with petitioner's cost experience. Thus, the facts here are distinguishable from those set forth in Bausch & Lomb, Inc. v. Commissioner, 933 F.2d 1084 (2d Cir. 1991), *112 affg. 92 T.C. 525 (1989), upon which petitioner relies in support of its collateral estoppel argument. Respondent argues, in effect, that, because of material changes in the controlling facts, the Distributor Agreement should be deemed to have terminated. According to respondent, petitioner initially established SunPac to supplement petitioner's CSD production and to be a distributor of petitioner's CSD parts. However, in his memorandum in opposition, respondent contends: By 1979-80, the petitioners' basic philosophy changed. Sundstrand began phasing out its dual sourcing capabilities. Consequently, SunPac was relied upon by Sundstrand as the primary supplier of Sundstrand's CSD parts needs. Additionally, it was quite clear by this time that SunPac was not to become a distributor of Sundstrand parts beyond a token role. During 1979-80, of the approximately $ 71 million in sales by SunPac, nearly $ 68 million went directly back to Sundstrand -- over 95 percent of SunPac's overall sales. These sales constituted a dramatic increase from those which SunPac originally enjoyed during 1977-78. [3] [Citations omitted.] *113 Respondent also contends that for 1979 and 1980, petitioner consumed internally SunPac parts substantially beyond the 50 percent it used in 1977 and 1978. According to respondent, unlike Sundstrand I, the impact of the differing usages of SunPac parts is demonstrable for 1979 and 1980. Furthermore, respondent argues that petitioner often incurred losses on its sales of CSD units containing SunPac parts and on its resale of the SunPac parts although SunPac enjoyed a profit on the sale of the parts to petitioner. Respondent argues that these factors are material changes to the controlling facts underlying the Court's decision in Sundstrand I. According to respondent, the factual variations in the present case affect the pricing approach to be applied under the applicable regulations. Respondent suggests that the following approaches may be utilized in the present case: (i) Raufoss may provide a direct comparable for establishing the transfer price of Sunpac parts for use in Sundstrand's internal operations (and not resold as spare parts). Alternatively, to the extent the CSD parts and circumstances surrounding their sale are not identical to the Sundstrand-SunPac transactions, *114 Raufoss may be utilized as part of some other pricing approach. (ii) The resale price method, utilizing other OEM manufacturers as comparables, may be part of the resale price approach for valuing Sunpac parts used by Sundstrand in its internal manufacturing operations; (iii) Aerospace manufacturers of component parts and Raufoss may provide the basis for applying the cost plus method for determining an arm's-length transfer price on semi-completed parts. (iv) The Court's approach in Sundstrand I constituted a fourth "appropriate method" which, with adjustments for changes in controlling facts, could again be applied in the present case. [Fn. ref. omitted.]
We agree with petitioner, however, that the Distributor Agreement continued in force during the years in issue and, thus, cannot be ignored. Consequently, it would be inappropriate to base the transfer price for SunPac parts for any particular year on the actual costs incurred, and the actual usage of those parts, in that year. It seems to us that the Distributor Agreement assumes petitioner would determine appropriate prices for the SunPac parts for any particular year at the end of the preceding year (or such earlier *115 time as it makes its next year's catalog price determinations) using projections developed from historical costs and its standard forecasting methodology. An appropriate arm's-length price for the SunPac parts under the Distributor Agreement, thus, should be determined on the basis of the information available at the time petitioner normally determines its catalog prices for the coming year and not on the actual results of operations for the year in question. In that sense, respondent is estopped from arguing that the catalog prices are not "the appropriate starting point for establishing an arm's-length consideration for the SunPac parts" resold by petitioner. Sundstrand Corp. v. Commissioner, 96 T.C. at 376. Respondent is not estopped, however, from arguing that a discount rate greater than 20 percent is appropriate for the years in issue. D. Services Issue
In Sundstrand I, for the first time on brief respondent argued in the alternative that petitioner rendered valuable services to SunPac for which SunPac did not compensate petitioner at an arm's-length charge. Respondent did not present any expert or other evidence specifically directed to this *116 services argument. We found that respondent had waited too long to raise this argument and, therefore, we refused to consider it. Nonetheless, we found that some allocation for the services petitioner rendered to sunpact was needed to clearly reflect income. We used the cost to petitioner of rendering the technical assistance to SunPac for our allocation because the record developed in Sundstrand I did not support a greater amount. Sundstrand Corp. v. Commissioner, 96 T.C. at 346-349, 395-398. In the instant case respondent raised the services theory in the notice of deficiency. Nonetheless, petitioner contends that our holding on the services theory in Sundstrand I is controlling here and that any section 482 adjustment for services must be limited to the difference between the actual costs rendered and the 3-percent technical assistance fee SunPac paid to petitioner pursuant to Amendment No. 11 to the SunPac License. Respondent argues, on the other hand, that the value of the services rendered in any year must be determined on the basis of the nature and extent of the services actually performed in that year. We agree with respondent. Generally, when *117 one member of a controlled group performs "marketing, managerial, administrative, technical, or other services" for another member of the group for less than adequate consideration, respondent may reallocate income under section 482 to reflect an arm's-length charge for those services. Sec. 1.482-2(b)(1), Income Tax Regs. The arm's-length charge shall be the amount which was charged or would have been charged for the same or similar services in independent transactions with or between unrelated parties under similar circumstances considering all relevant facts. However, except in the case of services which are an integral part of the business activity of either the member rendering the services or the member receiving the benefit of the services * * * the arm's-length charge shall be deemed equal to the costs or deductions incurred with respect to such services by the member or members rendering such services unless the taxpayer establishes a more appropriate charge under the standards set forth in the first sentence of this paragraph. * * * [Sec. 1.482-2(b)(3), Income Tax Regs.]
In its memorandum in support of motion for partial summary judgment petitioner alleges that *118 it "continued to render the same technical assistance services to SunPac during the 1979-80 taxable years, both from a qualitative and quantitative standpoint." Whether this allegation is true is a question of fact. Petitioner also states that we held in Sundstrand I that the services it rendered to SunPac were not "integral" under section 1.482-2(b), Income Tax Regs. Actually, we stated that "we are not convinced from this record that the services rendered by petitioner to SunPac are an integral part of the business activity of either petitioner or SunPac as argued by respondent. Sec. 1.482-2(b)(7), Income Tax Regs." Sundstrand v. Commissioner, 96 T.C. at 398. (Emphasis added.) The tests for determining whether services are an integral part of the business activity of a controlled group member are set forth in section 1.482-2(b)(7), Income Tax Regs. The pertinent portions of this section provide as follows: (7) Certain services. * * * (i) Services are an integral part of the business activity of a member of a controlled group where either the renderer or the recipient is engaged in the trade or business of rendering similar services to one or more *119 unrelated parties. (ii)(a) Services are an integral part of the business activity of a member of a controlled group where the renderer renders services to one or more related parties as one of its principal activities. Except in the case of services which constitute a manufacturing, production, extraction, or construction activity, it will be presumed that the renderer does not render services to related parties as one of its principal activities if the cost of services of the renderer attributable to the rendition of services for the taxable year to related parties do not exceed 25 percent of the total costs or deductions of the renderer for the taxable year. Where the cost of services rendered to related parties is in excess of 25 percent of the total costs or deductions of the renderer for the taxable year or where the 25-percent test does not apply, the determination of whether the rendition of such services is one of the principal activities of the renderer will be based on the facts and circumstances of each particular case. Such facts and circumstances may include the time devoted to the rendition of the services, the relative cost of the services, the regularity with which *120 the services are rendered, the amount of capital investment, the risk of loss involved, and whether the services are in the nature of supporting services or independent of the other activities of the renderer. * * * (iii) Service are an integral part of the business activity of a member of a controlled group where the renderer is peculiarly capable of rendering the services and such services are a principal element in the operations of the recipient. The renderer is peculiarly capable of rendering the services where the renderer, in connection with the rendition of such services, makes use of a particularly advantageous situation or circumstance such as by utilization of special skills and reputation, utilization of an influential relationship with customers, or utilization of its intangible property * * *. However, the renderer will not be considered peculiarly capable of rendering services unless the value of the services is substantially in excess of the costs or deductions of the renderer attributable to such services. (iv) Services are an integral part of the business activity of a member of a controlled group where the recipient has received the benefit of a substantial *121 amount of services from one or more related parties during its taxable year. For purposes of this subdivision, services rendered by one or more related parties shall be considered substantial in amount if the total costs or deductions of the related party or parties rendering services to the recipient during its taxable year which are directly or indirectly related to such services exceed an amount equal to 25 percent of the total costs or deductions of the recipient during its taxable year. For purposes of the preceding sentence, the total costs or deductions of the recipient shall include the renderers' cost or deductions directly or indirectly related to the rendition of such services and shall exclude any amounts paid or accrued to the renderers by the recipient for such services and shall also exclude any amounts paid or accrued for materials the cost of which is properly reflected in the cost of goods sold of the recipient. At the option of the taxpayer, where the taxpayer establishes that the amount of the total costs or deductions of a recipient for the recipient's taxable year are abnormally low due to the commencement or cessation of an operation by the recipient, or *122 other unusual circumstances of a nonrecurring nature, the costs or deductions referred to in the preceding two sentences shall be the total of such amount for the 3-year period immediately preceding the close of the taxable year of the recipient (or for the first 3 years of operation of the recipient if the recipient had been in operation for less than 3 years as of the close of the taxable year in which the services in issue were rendered).
Thus, the determination as to the value of the services rendered by petitioner to SunPac must be made on the basis of the facts and circumstances present during the 1979 and 1980 years in light of the tests set forth in the regulations. Consequently, our holding on this issue in Sundstrand I is not controlling for the 1979 and 1980 years and respondent is not collaterally estopped from arguing, for the 1979 and 1980 years, that the arm's-length charge for those services is not limited to the cost or deductions incurred with respect to those services by the member or members rendering the services. E. Interest on Loans or Indebtedness Issue
Respondent argues further that to the extent the technical assistance petitioner rendered to *123 SunPac in 1979 and 1980 is not reimbursed, SunPac's obligation to repay petitioner constitutes an interest-free loan to SunPac. This issue was raised in the notice of deficiency for 1979 and 1980. An allocation of income based on an arm's-length rate of interest on loans or indebtedness was not presented in Sundstrand I. Consequently, respondent is not collaterally estopped from litigating this issue in the instant case. Accordingly, petitioners' motion for partial summary judgment on the section 482 issue will be granted in part and denied in part. To reflect the foregoing, An appropriate order will be issued. 200 #SID001000000EGCK3# Footnotes
1. All section references are to the Internal Revenue Code of 1954 in effect for the taxable years in issue, unless otherwise noted. All Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. For some reason, Amendment No. 12 was executed before Amendment No. 11.↩
3. Following the filing of petitioners' motion for partial summary judgment, this case was consolidated with docket No. 1875-91, which pertains to petitioners' 1981 and 1982 years. Had petitioners included the 1981 and 1982 years in their motion for partial summary judgment, our holding would have applied equally to those years.↩
4. Petitioner and Raufoss, a Norwegian munitions manufacturer, entered into a contract during 1976 for Raufoss' production of specific CSD parts for the F-16 military program. Petitioner made preproduction payments to Raufoss before 1979 under the 1976 contract, but only purchased parts from Raufoss beginning in 1979. Petitioner entered into the transaction with Raufoss due to a European-sourcing requirement related to petitioner's sale of F-16 CSD's to NATO members' air forces. The transfer price was based on Raufoss' cost plus a 12-percent profit. Raufoss did not sell military CSD parts to petitioner during 1977-1978 or 1979-1980 that also were manufactured by SunPac during those years. Raufoss did not produce the parts for resale as spare parts.↩
3. For 1979-80, SunPac sales increased over 280 percent from its sales for the prior two year period. [Citations omitted.]↩