THEODORE B. JEFFERSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3585–67. Filed September 26, 1968.

Theodore B. Jefferson, pro se.
*James E. Caldwell*, for the respondent.

DAWSON, *Judge:* Respondent determined a deficiency of $599.90 in petitioner's income tax for the year 1963. The single question presented is whether petitioner is entitled to a capital loss carryover deduction of $1,000 in the year 1963 arising out of a sale of property in 1961 for less than its purchase price.

FINDINGS OF FACT

Theodore B. Jefferson (herein referred to as petitioner) and his wife Elsie R. Jefferson, now deceased, filed their 1963 Federal income tax return with the district director of internal revenue at Chicago, Ill. Petitioner was a resident of Skokie, Ill., at the time he filed his petition in this proceeding.

Petitioner is an engineer who entered into the publishing business about 1940. His occupation was listed in his 1963 Federal income tax return as "publishing." Beginning in 1937 petitioner purchased and sold over the course of years several pieces of real estate which were

utilized for both business and residential purposes. A vacant lot in Kansas City, Mo., was purchased by him in 1937 and was sold in 1950 at approximately a $2,000 profit. He purchased an industrial building on three lots in Kansas City, Mo., in 1940 which was sold at a $4,000 profit in 1948. In 1945 he purchased a house and vacant lot next door to his personal residence in Skokie, Ill., which he sold at a $7,000 profit 7 years later. He purchased three lots adjacent to this land in 1951 and erected a house which is his present residence.

In order to prevent publicity of his real estate transactions, petitioner formed in 1957 a wholly owned corporation, the Diamond-J Corp., through which he purchased for $30,000 in February 1957 a building in Skokie, Ill., which was remodeled and used in his publishing business. Shortly after the purchase, petitioner was offered $33,000 for the building which is presently valued at over $50,000. Additional purchases of real estate were made by the Diamond-J Corp. in 1958 when it acquired a store and an apartment in Morton Grove, Ill., which have been rented since that time, and in 1962 when two vacant lots adjacent to the store were acquired and converted into parking lots.

In 1960 petitioner purchased in his own name a summer house on Lake Michigan which was sold 4 years later, after the death of his wife, at a $1,000 loss. The house was never rented. In 1965 he purchased a mansion and 28 acres of land in Deerfield, Ill., which have been rented since that time. Petitioner acquired in his own name in January 1968 property with two parking lots in Morton Grove, Ill., which has been rented since that time.

Throughout this period the petitioner's personal residence and publishing business were located in Skokie, Ill.

Petitioners' parents resided in a house in Kansas City, Mo., which they purchased for approximately $25,000 and which was located in "one of the finest residential areas in Kansas City" near a country club. After the death of her husband, petitioner's mother continued to occupy the house. However, in 1953 she began to express concern about its management. In January 1953 petitioner agreed to purchase the house from his mother at the appraised real estate value when she was ready to sell "so she would be relieved from the worry of selling the house," and because "it would be a good buy for a profit-making proposition." He gave her $2,000 "earnest money" at that time.

In 1958 petitioner's mother decided to sell the house, and petitioner paid her $16,500, a sum equal to its appraised value at that time. She continued to live in the house without paying rent until 1960 when, at the age of 79, she moved to Skokie, Ill., to live with petitioner. During

the period after 1958 when she occupied the house, petitioner made several improvements in it, including a new furnace, a new driveway, and new overhead garage doors. Petitioner's mother did not drive an automobile at that time.

The house was placed on the market for sale in 1960 at a price of $18,500 which was recommended by a real estate dealer. It remained unoccupied for approximately 20 months before a sale was made for $15,750 on November 27, 1961. Petitioner was charged an additional fee of $540 in connection with financing arrangements.

Petitioner entered into the transaction involving the purchase and sale of his mother's house primarily for profit.

On his 1961 Federal income tax return, petitioner listed the cost of the house and improvements as $17,553.47 and expenses of sale as $1,964.40 and calculated a capital loss of $3,767.87. He claimed a capital loss deduction of $1,000 on each of his income tax returns for the years 1961, 1962, and 1963.

Respondent disallowed the claimed deductions for the years 1961 and 1962, and petitioner filed a petition for redetermination with this Court. In *Theodore B. Jefferson* v. *Commissioner*, docket No. 322–65, T.C. Memo. 1967–151, we held that petitioner failed to prove that he entered into the transaction with his mother primarily for profit and denied for the years 1961 and 1962 any deduction arising out of the transaction.

OPINION

Petitioner asserts that he has introduced sufficient evidence into this record to establish that the purchase and sale of his mother's residence was a transaction entered into primarily for profit rendering the sustained loss deductible under section 165(c)(2), I.R.C. 1954,[1] subject to the limitation of section 1211(b) [2] and the carryover provisions of

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.
SEC. 165. LOSSES.
(a) GENERAL RULE.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

\* \* \* \* \* \* \*

(c) LIMITATION ON LOSSES OF INDIVIDUALS.—In the case of an individual, the deduction under subsection (a) shall be limited to—

\* \* \* \* \* \* \*

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; \* \* \*
[2] SEC. 1211. LIMITATION ON CAPITAL LOSSES.
(b) OTHER TAXPAYERS.—In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. \* \* \*

section 1212(b)(1)(B).[3] Petitioner has expressly denied that he has engaged at any time in the purchase and sale of real estate as a trade or business.

Despite the fact that the issue in controversy here turns upon an ultimate fact litigated in the prior proceeding in this Court, respondent did not raise in his answer or by motion the defense of collateral estoppel [4] and does not rely upon the defense in his argument. See *Walter Wilson Flora*, 47 T.C. 410 (1967).

Res judicata, as well as the related doctrine of collateral estoppel, operates not as a jurisdictional bar but by way of estoppel. See *Scholla v. Scholla*, 201 F. 2d 211 (C.A.D.C. 1953), certiorari denied 345 U.S. 966. "And the policy underlying res judicata is not self-executing, since a prior adjudication must be properly pleaded or otherwise called to the court's attention." 1B Moore's, Federal Practice, par. 0.405[1] (2d ed. 1965). Thus, it has been held that the parties may agree that a prior judgment will not operate as a bar. *Riordan v. Ferguson*, 147 F. 2d 983 (C.A. 2, 1945). The well-established rule in this Court is that collateral estoppel and res judicata are affirmative defenses which must be pleaded. *Arthur D. Thomson*, 42 T.C. 825 (1964), affirmed sub nom. *Metcalf v. Commissioner*, 343 F. 2d 66 (C.A. 1, 1965); *Denver & Rio Grande Western Railroad Co.*, 32 T.C. 43 (1959), affd. 279 F. 2d 368 (C.A. 10, 1960); *Benjamin R. Britt*, 40 B.T.A. 790 (1939), affd. 114 F. 2d 10 (C.A. 4, 1940); *Reserve Natural Gas Co. of Louisiana*, 15 B.T.A. 951 (1929); see Rule 14(b), Tax Court Rules of Practice.

The consequence of respondent's failure to plead collateral estoppel or to make it the subject of a motion must be that the defense is not

---

[3] SEC. 1212. CAPITAL LOSS CARRYOVER.

(b) OTHER TAXPAYERS.—

(1) In general.—If a taxpayer other than a corporation has a net capital loss for any taxable year beginning after December 31, 1963—

\*     \*     \*     \*     \*     \*     \*

(B) the excess of the net long-term capital loss over the net short-term capital gain for such year shall be a long-term capital loss in the succeeding taxable year. For purposes of this paragraph, in determining such excesses an amount equal to the excess of the sum allowed for the taxable year under section 1211(b) over the gains from sales or exchanges of capital assets (determined without regard to this sentence) shall be treated as a short-term capital gain in such year.

[4] "Inasmuch as each tax year must stand on its own for Federal income tax purposes, questions involving the same taxpayer's tax liability for different taxable years are considered to give rise to separate causes of action, even though the issues involved might be the same. Consequently, the more limited doctrine of collateral estoppel is more frequently applied in income tax litigation than is the doctrine of res judicata." *Walter Wilson Flora*, 47 T.C. 410, 413 (1967). See also 3 Casey, Federal Tax Practice, sec. 11.18 (1955).

For a comprehensive statement of the defense of collateral estoppel see *Commissioner v. Sunnen*, 333 U.S. 591 (1948); *John W. Amos*, 43 T.C. 50 (1964), affd. 360 F. 2d 358 (C.A. 4, 1965); and *Estate of William G. Maguire*, 50 T.C. 130 (1968).

available to him. Such is the general rule under common law, code, and modern pleading. James, Civil Procedure, sec. 4.9 (1965).[5]

Further, our prior decision does not constitute a judicial determination of the ultimate fact presented in the present case which we must accept as conclusive evidence. See *Standard Oil Co.*, 43 B.T.A. 973 (1941). We made no finding as to petitioner's primary purpose in entering into the transaction involving his mother's house. Our decision was based solely upon the ground that petitioner had failed to prove that he entered into the transaction primarily for profit.

Respondent has pressed only the principle of stare decisis in an attempt to accomplish the same result, i.e., to foreclose consideration of the additional evidence presented by petitioner at trial. In so doing, respondent has failed to recognize the diverse rationale of collateral estoppel and stare decisis. Collateral estoppel "rests upon considerations of economy of judicial time" and operates "to relieve the government and the taxpayer of 'redundant litigation of the identical question of the statute's application to the taxpayer's status.'" *Commissioner* v. *Sunnen*, 333 U.S. 591, 597, 599 (1948). In other words, a taxpayer should have his "day in court," but if he fails to establish his claim, he should not be afforded another opportunity in subsequent litigation, provided, of course, as stated above, that his adversary properly objects, to shore up deficiencies in the evidence which defeated his claim. On the other hand, the doctrine of stare decisis, which arose from a necessity to preserve the harmony and stability of the law, requires adherence by courts to a *principle of law* settled by a series of decisions. 21 C.J.S., Courts, secs. 187, 188; 10 Mertens, Law of Federal Income Taxation, sec. 60.21 (1964 rev.). The doctrine does not apply to compel the same decision in two cases involving essentially factual determinations where there appear material differences in the facts presented. See *Denver & Rio Grande Western Railroad Co.*, *supra*.

We have concluded that petitioner is not collaterally estopped from relitigating the nature of the purchase and sale of his mother's house. It therefore follows that only if there are no material differences in the evidence presented in the instant case tending to show that petitioner entered into the transaction primarily for profit will the same legal conclusion, i.e., that petitioner failed to sustain the burden of proving that he is entitled to a capital loss carryover deduction, be compelled

---

[5] Sec. 4.9 provides further that "if the existence of the defense is made to appear incidentally from evidence which is offered and admitted for other purposes, defendant is precluded from taking advantage of the defense because he has waived it by his failure to set in up affirmatively." Accord, rules 8(c) and 12(h), Fed. R. Civ. P.; *Scholla* v. *Scholla*, 201 F. 2d 211 (C.A.D.C. 1953), certiorari denied 345 U.S. 966.

by the doctrine of stare decisis. Cf. *Journal-Tribune Publishing Co.* v. *Commissioner*, 348 F. 2d 266 (C.A. 8, 1965). We think the petitioner has established material facts missing in the record made in the prior case[6] which render stare decisis inapplicable and which compel a contrary conclusion.

Section 165 allows in the case of individual taxpayers a deduction for losses incurred in any transaction entered into for profit, though not connected with a trade or business. This provision has been interpreted to refer to all transactions induced *primarily*[7] by a profit motive. *Austin* v. *Commissioner*, 298 F. 2d 583 (C.A. 2, 1962), affirming 35 T.C. 221 (1960); *Early* v. *Atkinson*, 175 F. 2d 118 (C.A. 4, 1949). In this context "primarily" should be given its ordinary and everyday meaning, viz, "of first importance" or "principally." See *Malat* v. *Riddell*, 383 U.S. 569, 572 (1966).

The parties agree that petitioner was motivated to purchase his mother's house both by a personal concern for his mother's welfare and by a business concern to "turn a profit on [the] deal." They differ, however, in their conclusions as to which of the two motives was primary. After a careful review of this record, including key facts which were not established in the prior case, we have found as a fact (see *Austin* v. *Commissioner*, *supra*) that petitioner purchased his mother's house primarily for profit.

Petitioner has shown that over a period of 30 years he has engaged in at least 10 real estate transactions, 7 of which were business in nature. On all sales of land he has realized a total profit of approximately $12,000. He estimates the total value of the land currently owned in his own name or in the name of his wholly owned corporation at $550,000, subject to outstanding mortgages. Three parcels of land are currently being rented at a total yearly rental of approximately

---

[6] In *Theodore B. Jefferson*, 26 T.C.M. 709, 710, 36 P-H. Memo. T.C. par. 67, 151 (1967), we observed:

"In attempting to evaluate the petitioner's contentions as to his reasons for purchasing the property, we are again handicapped by a lack of evidence. * * * The petitioner says that he owned other properties. If he had established that he bought and sold other properties as an investment, such evidence would tend to support his position in this case, but he has failed to give us sufficient information concerning his other investments—we do not know the number of them or whether they were purchased and held for sale at a profit. The petitioner also tells us that he improved his mother's property, but he has not shown us whether those improvements were made to facilitate his mother's enjoyment of the property or whether they were made to enhance its marketability."

In the present case the petitioner has presented evidence as to other real estate transactions of a business nature and the improvements made to the property purchased from his mother. The legal significance of the additional evidence on these points is discussed *infra*. It is sufficient to establish the requisite profit motive.

[7] Other verbal formulations for the same concept include "prime thing" (*Weir* v. *Commissioner*, 109 F. 2d 996, 999 (C.A. 3, 1940)), "predominating idea" (*W. W. Holloway, Administrator*, 19 B.T.A. 378, 379 (1930)), and "predominating factor" (*Henry J. Gordon*, 12 B.T.A. 1191, 1194 (1928)).

$15,000. This establishes a pattern of investment in real property for profit and, as petitioner states, "as a hedge against inflation."

At the time petitioner tendered $2,000 "earnest money" to his mother, he was well aware of land values both in the area of Kansas City where the house was located and generally in the Midwest. He considered the country club area, in which the house was situated, to be "one of the finest residential areas in Kansas City." Land values in general were increasing as evidenced by several profitable sales previously made by petitioner.

Petitioner's decision to purchase the house in 1958 followed close upon the heels of a particularly successful purchase in 1957 of a building and land through the Diamond–J Corp. which appreciated in value $3,000, or 10 percent, within a matter of months. Petitioner felt at that time that "real estate was booming" and that he "could make some money on the place in Kansas City, if it was improved properly." We consider it important that petitioner did not pay his mother an inflated amount for the house. The purchase price was determined by an independent appraiser at the time of purchase.

Petitioner permitted his mother to stay in the house without paying rent for over a year while improvements were completed. The major improvements consisted of a new gas furnace, a new driveway, and overhead garage doors. It is significant to note that petitioner's mother was 79 years old at the time and did not drive an automobile. Petitioner determined that the driveway which "was in horrible condition" had to be improved in order to make the house marketable.

The house was placed on the market for sale in 1960 at the price of $18,500 recommended by a real estate dealer which would have given petitioner a profit on the transaction. Thereafter petitioner's mother became ill and moved to petitioner's residence in Skokie, Ill. The house was sold at a loss only after it remained on the market unoccupied for approximately 20 months. We do not infer the absence of a dominant profit motive simply because the real estate market did not, at the time of sale, measure up to petitioner's expectations forcing a sale of the house at a loss.

This transaction clearly fits the pattern of real estate purchases by petitioner for profit. To be sure, personal considerations entered into the picture. Petitioner accomplished the personal objective of relieving his mother of the problems of selling the house should she decide to move. But he could have achieved the same objective by merely handling a sale for her. It is obvious that he need not have purchased the house to provide a rent-free place for his mother to live since she already was its sole owner. The evidence is compelling that petitioner's choice of alternatives was prompted primarily by profit motives.

Section 1.165–9(b), Income Tax Regs.,[8] cited by respondent, is inapplicable since the house was not "purchased or constructed by the taxpayer for use as *his personal residence.*" Accordingly, the absence of rental prior to its sale is not determinative.

*Decision will be entered for the petitioner.*

---

[8] Sec. 1.165–9(b). *Property converted from personal use.* (1) If property purchased or constructed by the taxpayer for use as his personal residence is, prior to its sale, rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss sustained on the sale of the property shall be allowed as a deduction under section 165(a).