109 T.C. No. 11


UNITED STATES TAX COURT


JOHN M. AND RITA K. MONAHAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11062-95.                    Filed October 23, 1997.


    1.  <u>Held</u>:  This Court may raise sua sponte the
doctrine of issue preclusion, or collateral estoppel.
    2.  <u>Held</u>, <u>further</u>, interest payments that were
credited to a partnership's bank account are taxable to
Ps because P controlled partnership matters and
benefited from and controlled the funds in that
account.
    3.  <u>Held</u>, <u>further</u>, a $25,000 payment that was
deposited in Ps' bank account is taxable to Ps because
Ps failed to prove that the payment represents
reimbursement of legal fees paid by P on behalf of a
corporation.
    4.  <u>Held</u>, <u>further</u>, sec. 6662(a), I.R.C., accuracy-
related penalty imposed for substantial understatement
of income tax.

F. Michael Kovach, Jr., for petitioners.

Cathy A. Goodson, for respondent.


OPINION

HALPERN, Judge: By notice of deficiency dated April 14, 1995, respondent determined a deficiency in petitioners' Federal income tax for 1991 of $161,055 and a penalty under section 6662(a) of $32,211. Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. In addition, all references to petitioner are to John M. Monahan.

After concessions by respondent, the issues for decision are (1) whether certain interest payments that were credited to a partnership's bank account are taxable to petitioners, (2) whether a $25,000 payment that was deposited in petitioners' bank account is taxable to petitioners, and (3) whether petitioners are liable for the penalty. The parties have stipulated various facts, which we so find. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. We need find few facts in addition to those stipulated; accordingly, we shall not separately set forth our additional findings of fact and shall include those findings in

the discussion that follows. Petitioners bear the burden of proof on all questions of fact. Rule 142(a).

## I. Background

Petitioners resided in Seattle, Washington, when the petition in this case was filed.

Petitioner is a lawyer specializing in corporate and international trade law with emphasis in tax planning and complex corporate transactions. Petitioner received an LL.M. (with emphasis in taxation) from New York University School of Law.

Petitioners are calendar year taxpayers.

## II. Interest Payments Credited to Aldergrove's Bank Account

### A. Introduction

#### 1. Aldergrove

Aldergrove Investments Co. (Aldergrove), was a partnership between Grove Management Ltd. (GML), see infra sec. II.A.2., and petitioner. Aldergrove's principal place of business was on Anguilla (an island of the British West Indies). Aldergrove did not file a U.S. Partnership Return of Income for 1991. Petitioners did not report any income from Aldergrove for 1991.

Pursuant to the Aldergrove partnership agreement, effective July 1, 1984, partnership interests and capital contributions were as follows:

|           | Class A               | Class B                  |
|-----------|-----------------------|--------------------------|
| GML       | 10 percent<br>$1,000  | 100 percent<br>$569,000  |
| Petitioner| 90 percent<br>$9,000  | none                     |

Class B partnership units were nonvoting, and, in partnership matters affecting both classes, partners voted in proportion to their percentage ownership of Class A partnership units.

2. <u>GML</u>

GML was a wholly owned subsidiary of Span Corp., Ltd., which, in turn, was wholly owned by Lynwood S. Bell (Mr. Bell), a Canadian citizen residing in Anguilla. Petitioner and GML entered into an agreement, effective July 1, 1984, that required petitioner to manage GML's investments and to provide investment advice. GML transferred assets to Aldergrove for management.

3. <u>Jaguar Holdings/Ihatsu Fudosan and Hansa Finance</u>

Jaguar Holdings, Ltd. (Jaguar Holdings), was wholly owned and controlled by Mr. Bell, and, on or about August 1, 1988, its name was changed to Ihatsu Fudosan Capital, Ltd. (Ihatsu Fudosan).

Hansa Finance and Trust, B.V. (Hansa Finance), was owned and operated by Mr. Bell.

4. <u>Chestnut Grove and Group M</u>

During 1991, petitioner was a 45-percent shareholder of both Chestnut Grove Investments, Inc. (Chestnut Grove), and Group M

Construction, Inc. (Group M). Petitioner's brothers, Timothy E. Monahan and Peter J. Monahan, owned 45 percent and 10 percent, respectively, of the outstanding stock of both Chestnut Grove and Group M. Those corporations were organized for the purpose of acquiring and developing a 16-acre parcel located in Yakima, Washington (the Yakima property). That parcel was purchased in March 1987 for $400,000.

B. Transactions in Issue

A check that was drawn on an account held by Chestnut Grove and made payable to "Ihatsu Fudosan or Aldergrove Investment" in the amount of $116,000 for "interest" was endorsed "Dep only" to account number 250-0132969 at Security Pacific Bank (SP Bank), which account was held in the name of Aldergrove (the Aldergrove account). On December 26, 1991, SP Bank credited the Aldergrove account in the amount of $116,000.

A check that was drawn on an account held by Group M and made payable to "Ihatsu Fudosan or Aldergrove Investment" in the amount of $84,700 for "interest" was endorsed "Dep only" to the Aldergrove account. On December 26, 1991, SP Bank credited the Aldergrove account in the amount of $84,700.

On December 31, 1991, SP Bank credited the Aldergrove account in the amount of $140.66 for interest earned by the account.

C. Analysis

   1. Issue

The issue is whether the interest payments that were credited to the Aldergrove account in the amounts of $116,000, $84,700, and $140.66 (the 1991 interest payments), are taxable to petitioners (the 1991 interest issue).

   2. Arguments of the Parties

Petitioners argue that Mr. Bell and his wholly owned corporations provided the financing that allowed Chestnut Grove and Group M to acquire the Yakima property. Petitioners argue that the checks in the amounts of $116,000 and $84,700, both made payable to Ihatsu Fudosan or Aldergrove (the Yakima interest payments), represent interest payments to Mr. Bell for the Yakima property loans and were held in trust for Mr. Bell by Aldergrove until those funds were transferred to a Bank of Bermuda account over which petitioner did not exercise any control, and, therefore, Mr. Bell is taxable on those payments, "regardless of whether Aldergrove Investments Co. was Petitioner's alter ego."

Alternatively, petitioners argue that petitioner lacked sufficient dominion and control over the Aldergrove account to be taxable on the 1991 interest payments. Petitioners argue that

petitioner has received no benefit from any of the 1991 interest payments and that those funds were transferred to a Bank of Bermuda account over which petitioner did not exercise any control.

Lastly, petitioners assert that, even if the Court were to find that Aldergrove must recognize the 1991 interest payments as income, petitioners are taxable only on petitioner's distributive share of that income.

Respondent asserts that this Court in Monahan v. Commissioner, T.C. Memo. 1994-201 (Monahan I), affd. without published opinion 86 F.3d 1162 (9th Cir. 1996),[1] found that, in 1991, petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds in the Aldergrove account.  Relying on the doctrine of collateral estoppel, respondent argues that petitioner is precluded from relitigating those issues.  Since the 1991 interest payments were deposited in the Aldergrove account in 1991, respondent argues that those payments are taxable to petitioner.

---

[1]    It should be noted that 9th Cir. R. 36-3 provides that dispositions other than opinions or orders designated for publication shall not be regarded as precedent and shall not be cited to or by the Court of Appeals for the Ninth Circuit or any district court of the Ninth Circuit, except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.

Respondent argues alternatively that, if the Court finds the doctrine of collateral estoppel to be inapplicable, the 1991 interest payments are taxable to petitioners because petitioner made acquisition and development loans for the Yakima property to Chestnut Grove and Group M and benefited from and exercised control over the 1991 interest payments.

### 3. Relevant Legal Principles

#### a. Interest Income

Section 61(a)(4) provides that gross income means all income from whatever source derived, including interest. "Generally, interest earned on investment is taxable to the person who controls the principal." P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084, 1086 (9th Cir. 1987) (citing Helvering v. Horst, 311 U.S. 112, 116-117 (1940)), affg. T.C. Memo. 1984-549. "`[C]ommand over property or enjoyment of its economic benefits * * *'", which is the mark of true ownership, is a question of fact to be determined from all of the attendant facts and circumstances. See Hang v. Commissioner, 95 T.C. 74, 80 (1990) (quoting Anderson v. Commissioner, 164 F.2d 870, 873 (7th Cir. 1947), affg. 5 T.C. 443 (1945)). Mere legal title is not determinative of beneficial ownership. See Serianni v. Commissioner, 80 T.C. 1090, 1104 (1983), affd. 765 F.2d 1051 (11th Cir. 1985).

### b.  The Doctrine of Issue Preclusion

The doctrine of issue preclusion, or collateral estoppel, provides that, once an issue of fact or law is "actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."  Montana v. United States, 440 U.S. 147, 153 (1979) (citing Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979)).  Issue preclusion is a judicially created equitable doctrine whose purposes are to protect parties from unnecessary and redundant litigation, to conserve judicial resources, and to foster certainty in and reliance on judicial action.  See, e.g., id. at 153-154; United States v. ITT Rayonier, Inc., 627 F.2d 996, 1000 (9th Cir. 1980).  This Court in Peck v. Commissioner, 90 T.C. 162, 166-167 (1988), affd. 904 F.2d 525 (9th Cir. 1990), set forth the following five conditions that must be satisfied prior to application of issue preclusion in the context of a factual dispute (the Peck requirements):

> (1) The issue in the second suit must be identical in all respects with the one decided in the first suit.
> (2) There must be a final judgment rendered by a court of competent jurisdiction.
> (3) Collateral estoppel may be invoked against parties and their privies to the prior judgment.
> (4) The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision.

(5) The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. [Citations omitted.]

See also Clark v. Bear Stearns & Co., 966 F.2d 1318, 1320 (9th Cir. 1992) (highlighting conditions (1) and (4) above).

### 4. Discussion

#### a. Preliminary Matters

By order of this Court dated April 8, 1996, respondent's motion for leave to file an amended answer to raise the affirmative defense of collateral estoppel in this case was granted. Respondent now bears the burden of proving the applicability of that defense. Rule 142(a).

The jurisdictional competency of this Court in Monahan I is not contested by the parties in this case. In addition, decision in Monahan I was entered by this Court on August 29, 1994, and was affirmed on appeal without modification by the Court of Appeals for the Ninth Circuit on May 31, 1996. Cf. Hudson v. Commissioner, 100 T.C. 590, 593-594 (1993) (refusing to apply the doctrine of collateral estoppel when an appellate court affirms a trial court's judgment on different grounds). No petition for certiorari having been duly filed, decision in Monahan I has become final under section 7481(a)(2)(A). Lastly, there is complete identity of parties between Monahan I and this case. Both petitioners and respondent were parties in Monahan I and are

bound by that decision.  In sum, conditions (2) and (3) of the Peck requirements are satisfied.

b.  The 1991 Interest Issue

The ultimate issue with respect to the 1991 interest payments is whether those payments constitute gross income to petitioners.  That issue was not litigated in Monahan I.  Thus, petitioners are not precluded from contesting respondent's determination that the 1991 interest payments are taxable to petitioners.  Although this Court in Monahan I found that "funds held in Aldergrove were used by and benefited petitioner personally", including funds credited to the Aldergrove account on December 26, 1991, see infra sec. II.C.4.c., and command over property or enjoyment of its economic benefits determines the incidence of taxation, see supra sec. II.C.3.a., the Court did not find that all interest payments credited to the Aldergrove account in 1991 are taxable to petitioners.  Certainly, this Court in Monahan I did not decide the 1991 interest issue.  The equitable doctrine of issue preclusion requires that petitioners be given an opportunity to litigate the 1991 interest issue.[2]

---

[2]    That may simply be a different way of saying that the doctrine of claim preclusion does not apply.  In this context, the scope of the issue preclusion analysis blurs the distinction between claim preclusion and issue preclusion.  See McClain v. Apodaca, 793 F.2d 1031, 1033 (9th Cir. 1986) ("The concept of res judicata embraces two doctrines, claim preclusion and issue
(continued...)

Respondent directs our attention to this Court's holding in Monahan I that interest income earned by Aldergrove on certified deposit accounts in 1985 constituted income to petitioners. It is unclear whether respondent believes that that determination is dispositive of the 1991 interest issue. We believe, however, that our holding in Monahan I with respect to the 1985 interest income does not preclude petitioners from litigating the 1991 interest issue. The doctrine of issue preclusion must be applied carefully so that fairness to litigants is not compromised for efficiency and economy.[3] Some courts have advised narrow application of the doctrine in the context of tax litigation. See, e.g., Kennedy v. Commissioner, 876 F.2d 1251, 1257 (6th Cir. 1989), affg. Gray v. Commissioner, 88 T.C. 1306 (1987); 18 Moore, Moore's Federal Practice, par. 132.02, at 132-38 (3d ed. 1997). That approach appears to be a product of the "separable facts" doctrine, first enunciated in Commissioner v. Sunnen, 333 U.S. 591, 601 (1948). Although it is unclear whether the separable

---

[2](...continued)
preclusion (or collateral estoppel), that bar, respectively, a subsequent action or the subsequent litigation of a particular issue because of the adjudication of a prior action." (fn. ref. omitted)).

[3]     See United States v. Silliman, 167 F.2d 607, 614 (3d Cir. 1948) ("Such a rule of public policy [collateral estoppel] must be watched in its application lest a blind adherence to it tend to defeat the even firmer established policy of giving every litigant a full and fair day in court.").

facts doctrine is still good law in the tax context, see United States v. Stauffer Chem. Co., 464 U.S. 165, 172 n.5 (1984); Peck v. Commissioner, 904 F.2d 525, 527-528 (9th Cir. 1990), affg. 90 T.C. 162 (1988),[4] we believe, in any event, that denying a party the opportunity to litigate an issue is a matter that requires circumspection.  This Court will not use the doctrine of issue preclusion as a blunt instrument for summarily denying petitioners an opportunity to litigate the 1991 interest issue. Instead, we prefer the approach that follows.

### c.  The Aldergrove Issue

Issue preclusion may operate to preclude relitigation of evidentiary facts determined in a prior proceeding.  See, e.g., Meier v. Commissioner, 91 T.C. 273, 286 (1988).  Thus, facts that a party is precluded from relitigating in conjunction with other facts established by evidence in the latter proceeding may provide a basis to sustain a deficiency determination by the Commissioner.  Id. at 288-289.  The parties agree that the 1991 interest payments are interest payments that were credited to the Aldergrove account in 1991.  To establish that the 1991 interest

---

[4]    It should also be noted that the Court of Appeals for the Ninth Circuit, to which an appeal in this case would likely lie, stated that the Supreme Court limited the application of Commissioner v. Sunnen, 333 U.S. 591 (1948), to cases where there has been a significant change in the legal climate.  See, e.g., Peck v. Commissioner, 904 F.2d 525, 527 (9th Cir. 1990), affg. 90 T.C. 162 (1988).

payments are taxable to petitioners, respondent asserts that, in 1991, petitioner controlled Aldergrove partnership matters and that petitioner benefited from and controlled the funds in the Aldergrove account. Respondent relies on Monahan I and the doctrine of issue preclusion to establish those underlying facts.

In Monahan I, this Court considered the Commissioner's determination of deficiencies in and additions to petitioners' Federal income tax for 1984, 1985, 1986, 1987, and 1988. This Court, among other things, found that petitioner's purported repayment of his negative capital account in a partnership, Span Services, lacked economic substance and that petitioner, thus, recognized gain on the termination of his interest in that partnership. In rejecting petitioner's assertion that he had an obligation to repay Aldergrove for its payment of an obligation incurred to repay the negative capital account, this Court stated:

> Petitioners contend that petitioner then had an obligation to "contribute" to or repay Aldergrove as a result of its satisfaction of the joint $400,000 obligation. However, there was no written agreement regarding such an obligation. Petitioner's purported payments to Aldergrove on that "obligation" also lacked economic substance or remained in petitioner's control by virtue of his control over Aldergrove. Petitioner's first payment was made 2 years later, on February 25, 1988, when he transferred $125,000 to an Aldergrove account over which he had signature authority. On the same day, pursuant to petitioner's instructions Aldergrove transferred $110,200 to Hansa Finance and Trust, B.V. (Hansa Finance), an entity wholly owned and

controlled by Mr. Bell.  On March 2, 1988, Hansa Finance transferred $110,000 to Group M Construction, Inc., a Washington corporation owned by petitioner (from 45 to 50 percent during the years at issue) and his brothers (from 50 to 55 percent during the years at issue).  On March 7, 1988, Hansa Finance transferred $17,084.46 back to Aldergrove.

Petitioner made no additional payments to Aldergrove on the $400,000 "obligation" prior to filing his petition in this case on July 8, 1991.  He made two additional payments after this time.  On December 26, 1991, petitioner transferred $25,000 to Aldergrove.  On December 18, 1992, petitioner issued a check for $250,000 to Aldergrove and a check for $212,369 to "Ihatsu Fudosan, Ltd. or Aldergrove Investment".  Both checks were deposited into an Aldergrove account over which petitioner had signature authority.

Neither of these additional payments had economic substance.  At this time, petitioner's right to exercise his SAR's [stock appreciation rights] in GML was unrestricted.  The contribution to Aldergrove increased the value of both petitioner's and GML's partnership interest in Aldergrove.  Thus, it also increased the fair market value of GML's stock and petitioner's SAR's.  Petitioner exercised control over all Aldergrove partnership matters by virtue of his 90-percent voting interest.  Numerous other transactions also support the conclusion that funds held in Aldergrove were used by and benefited petitioner personally, including other "loans" to Group M Construction and Chestnut Grove Investments (also partially owned by petitioner) made through Hansa Finance.  We find, therefore, that none of the payments made by petitioner to Aldergrove in "repayment" of a purported $400,000 loan had economic substance.

Petitioner argued at trial and on brief that Mr. Bell had the ability to remove principal from GML or Aldergrove, thus reducing the value of petitioner's SAR's and placing Aldergrove funds beyond petitioner's control.  Mr. Bell apparently did make such a transfer only once.  However, even in this instance, the bulk of the funds removed were immediately transferred to Group M Construction and later back to Aldergrove.  As

we have already discussed, petitioner was clearly in control of the activities of both GML and Aldergrove. The money held by Aldergrove was part of petitioner's asset protection plan and primarily benefited petitioner. The allocation of Aldergrove's profits was subject to a partner vote, over which petitioner had control. Moreover, GML assigned its interest in the principal, issues, and profits of Aldergrove to petitioner as security for payment upon any exercise by petitioner of his SAR's. Finally, as discussed above, the formation of Span/Hansa Management, an integral part of petitioner's asset protection plan, provided an additional device by which petitioner obtained the benefits of funds flowing between Aldergrove, Span Corp., and GML. Petitioner was, in fact, the primary beneficiary of transactions between all these entities. [Monahan I; fn. ref. omitted.]

The Court of Appeals for the Ninth Circuit agreed with this Court and stated that the "taxpayers had ultimate control of the monies involved in all of the transactions at issue." Monahan v. Commissioner, 77 AFTR 2d 96-2340, at 96-2340, 96-2 USTC par. 50,386, at 85,271-85,272 (9th Cir. 1996).

In sum, this Court examined petitioner's relationship with Aldergrove Investments Co., the same partnership in issue in this case, and determined that certain payments made to Aldergrove, including a payment in the amount of $25,000 on December 26, 1991 (the $25,000 Aldergrove payment), lacked economic substance because petitioner exercised control over all Aldergrove partnership matters and benefited from and controlled the funds held by Aldergrove. The $25,000 Aldergrove payment considered in Monahan I was deposited in account number 250-0132969 at SP Bank,

the same account in which the 1991 interest payments were deposited. Indeed, the $25,000 Aldergrove payment was credited to the Aldergrove account on the same day as the Yakima interest payments were credited to that account. Thus, petitioner's control over Aldergrove partnership matters on December 26, 1991, and his benefit from and control over funds in the Aldergrove account on December 26, 1991 (together, the Aldergrove issue), is an issue that was decided in Monahan I and is identical to a factual issue relevant to respondent's determination of a deficiency in this case.[5]

In addition, the Aldergrove issue was actually litigated in Monahan I, and resolution of that issue was essential to the decision in Monahan I. Petitioners do not dispute satisfaction of that condition of the Peck requirements. Also, petitioners do not claim that the applicable legal rules have changed; however, they assert that issue preclusion does not apply because the

---

[5] Although respondent seeks to preclude petitioners from relitigating petitioner's control over Aldergrove partnership matters in 1991 and his benefit from and control over funds in the Aldergrove account in 1991, we believe that petitioner's control over Aldergrove partnership matters on Dec. 26, 1991, and his benefit from and control over funds in the Aldergrove account on Dec. 26, 1991, are the only facts that are necessarily established by this Court's finding in Monahan I that the $25,000 Aldergrove payment lacked economic substance. That is not to say that this Court in Monahan I found that petitioner's relationship with Aldergrove was any different on dates other than Dec. 26, 1991. See infra secs. II.C.4.d., e., and f.

controlling facts have changed. In particular, petitioners assert that petitioner and Mr. Bell were no longer on friendly terms in 1991 because Mr. Bell was being audited by the same revenue agent who audited petitioners for the taxable years in issue in Monahan I. As a result, petitioners claim that Geoffrey Briant, a Canadian citizen, became involved as a mediator with control over distributions from the Aldergrove account in 1991. That purported change in the controlling facts, however, would have been relevant to this Court in deciding Monahan I because the Aldergrove issue was critical to the Court's conclusion that petitioner's purported repayment of his negative capital account in Span Services lacked economic substance, but petitioners failed to raise Mr. Briant's alleged involvement in Aldergrove despite the opportunity to present evidence on that issue in Monahan I. The observation of the Court of Appeals for the Tenth Circuit in Jones v. United States, 466 F.2d 131, 136 (10th Cir. 1972), is apt:

> Evidence of this type is not the result of a different factual situation or changed circumstances. It is, instead, historical in nature and could have been admitted at the first trial if properly submitted. If the taxpayers' case was not effectively presented at the first trial it was their fault; affording them a second opportunity in which to litigate the matter, with the benefit of hindsight, would contravene the very principles upon which collateral estoppel is based and should not be allowed. * * *

See also <u>Yamaha Corp. of Am. v. United States</u>, 961 F.2d 245, 257

(D.C. Cir. 1992) (quoting <u>Jones v. United States</u>, <u>supra</u>).

Petitioners also assert the following as another change in

the controlling facts:

> [W]hen the case [Monahan I] was tried in January of
> 1993, Lyn Bell had not yet caused Grove Management
> Limited to be stricken from the Registry of Companies.
> His demonstrated and undisputed ability to dissolve
> Grove Management demonstrates his control over that
> company and proves that Aldergrove was not Petitioner's
> alter ego.

That purported change in controlling facts, according to

petitioners, is sufficient to prevent application of issue

preclusion.  Petitioners' assertion appears to be a variation of

an argument made in a memorandum in support of their motion for

reconsideration of Monahan I, filed June 13, 1994 (the

reconsideration motion).  In that memorandum, petitioners argued

as follows:

> When the case [Monahan I] was tried in January of
> 1993, Grove Management Limited was a solvent entity.
> The Court might reasonably conclude, as it did, that
> petitioner's SAR's in Grove Management, Ltd., were
> valuable assets.  In December of 1993, however,
> petitioners were advised by Anguillan counsel that GML
> was listed as an inactive corporation and was to be
> stricken from the Anguillan Register of Companies.
> Petitioners' SAR's were rendered worthless by the
> striking, and the Court's conclusion that the Monahans'
> retained control over funds placed in GML by virtue of
> those SAR's became untenable.

The Court of Appeals for the Ninth Circuit, in reviewing this

Court's denial of the reconsideration motion, rejected that

argument by stating that this Court "relied on evidence clearly showing that during the relevant time period taxpayers retained control over the funds.  That they lost their investments many years later is not relevant to their tax liabilities for the years at issue."  Monahan v. Commissioner, 77 AFTR 2d 96-2340, at 96-2341, 96-2 USTC par. 50,386, at 85,272 (9th Cir. 1996).

Similarly, we believe that this Court in Monahan I determined that, on December 26, 1991, petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds in the Aldergrove account, upon consideration of evidence relating to the relevant time period.  The fact that Mr. Bell may have exercised control over GML in 1993 is insufficient to deny preclusive effect to this Court's finding on the Aldergrove issue in Monahan I.  Essentially, petitioners question the propriety of that finding by claiming the existence of new evidence, but fail to show that the controlling facts underlying the Aldergrove issue have changed.  This Court, in Monahan I, was presented with evidence and argument relating to Mr. Bell's purported control over GML, but, upon consideration of that evidence and countervailing evidence, the Court rejected petitioners' assertion.  New evidence of Mr. Bell's purported control over GML would be cumulative only and does not alter the controlling facts underlying the Aldergrove issue during the

relevant time period.  Cf. Klein v. Commissioner, 880 F.2d 260, 263-264 (10th Cir. 1989) (this Court did not err in concluding that new expert testimony regarding the taxpayer's mental incompetency did not change the controlling facts for purposes of collateral estoppel when similar evidence had been presented and considered in the prior proceeding), affg. T.C. Memo. 1984-392.

In conclusion, we find that all five conditions of the Peck requirements have been satisfied with respect to the Aldergrove issue, and, therefore, petitioners are precluded from relitigating that issue.  Thus, we find that, on December 26, 1991, petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds in the Aldergrove account.

### d. Petitioners Attempt To Cast Doubt on the Sufficiency of the Aldergrove Issue

We shall now turn to an examination of the evidence in this case in light of the Aldergrove issue established in Monahan I. There is no dispute that the 1991 interest payments are interest payments that were credited to the Aldergrove account on December 26, 1991, and December 31, 1991.  That fact in conjunction with our finding that, on December 26, 1991, petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds in the Aldergrove account permits this Court to infer that petitioner had control over and

benefited from the 1991 interest payments. That inference would lead this Court to conclude that petitioners are taxable on the 1991 interest payments. See supra sec. II.C.3.a.

In an attempt to rebut the inference that petitioner had control over and benefited from the Yakima interest payments portion of the 1991 interest payments, petitioners assert the following: (1) on March 1, 1987, petitioner borrowed $200,000 from Mr. Bell, through Hansa Finance, and loaned those funds to Chestnut Grove and Group M to make the initial downpayment on the Yakima property; (2) on March 1, 1987, Chestnut Grove and Group M executed notes to petitioner for $23,382 and $176,618, respectively; (3) on March 1, 1988, petitioner borrowed $110,000 from Mr. Bell, through Hansa Finance, and loaned those funds to Group M to make a second payment for the Yakima property; (4) on March 1, 1988, Group M executed a note to petitioner for $110,000; (5) on August 1, 1988, Mr. Bell assigned petitioner's promissory notes to Jaguar Holdings (which became Ihatsu Fudosan); (6) on March 1, 1989, Group M borrowed $150,000 from Ihatsu Fudosan to make the final payment on the Yakima property and to maintain working capital; and (7) on November 1, 1991, Chestnut Grove and Group M executed assumption of liabilities agreements for the notes originally made by petitioner to Hansa Finance. On the basis of those alleged facts, petitioners argue

that the Yakima interest payments represent interest payments to Mr. Bell for the Yakima property loans and were held in trust for Mr. Bell by Aldergrove until those funds were transferred to a Bank of Bermuda account over which petitioner did not exercise any control, and, therefore, petitioners are not taxable on those payments.

Petitioners present the testimony of petitioner and of Timothy Monahan, petitioner's brother and president of both Chestnut Grove and Group M, and numerous documents to support their assertion that the Yakima interest payments represent interest paid to Mr. Bell. In response, respondent essentially relies on the Aldergrove issue and petitioners' concession that the funds allegedly loaned to petitioner by Hansa Finance were previously transferred to Hansa Finance from Aldergrove (petitioners' concession). Respondent asserts: "Hansa Finance should be considered a mere `straw man': Aldergrove advanced at least $200,000 of the money to Hansa before Hansa provided $310,000 to Petitioner." Petitioners respond as follows:

> When Respondent ominously intones that John Monahan "acknowledges on cross examination that Hansa first received the initial land acquisition funds ($200,000) from Aldergrove," * * * she forgets that $570,000 of Aldergrove Investments [sic] initial $579,000 of capital was contributed to Aldergrove by Bell acting through Grove Management Ltd., the wholly owned subsidiary of his wholly owned Span Corp., Ltd. * * *. Lynwood S. Bell shifted those funds from Aldergrove to Hansa Finance for the purpose of loaning

the money to John Monahan, whose own $9,000 capital contribution to Aldergrove Investments played no significant part in the transaction.  Although Respondent argues that Petitioner made the loans to Group M and Chestnut Grove Investments, * * * the partnership agreement reflects that Bell, and not John Monahan, is the ultimate source of the funds used by Group M and Chestnut Grove Investments to purchase the 16-acre Yakima parcel.  Accordingly, Bell, and not petitioners, is taxable on the interest paid by those corporations regarding the loans.

We agree with petitioners that the Aldergrove issue and petitioners' concession do not necessarily undermine petitioners' assertion that the Yakima interest payments represent interest paid to Mr. Bell because respondent has not established that Aldergrove was anything other than what it purported to be when funds were transferred to Hansa Finance.  In other words, the Aldergrove issue relates to petitioner's relationship with Aldergrove on December 26, 1991, and may provide reasonable inferences regarding petitioner's relationship with Aldergrove during the entirety of 1991, but does not provide a sufficient basis to undermine petitioners' contention that Mr. Bell was the "ultimate source" of the funds loaned to Chestnut Grove and Group M in 1987 and 1988.

e.  Other Factual Issues Established in Monahan I

(1)  Introduction

In respondent's brief, respondent asserts that this Court should give effect to the unambiguous findings of Monahan I and find that Petitioner is collaterally

estopped from relitigating the factual determinations that the Petitioner controlled Aldergrove partnership matters in 1991 and that the Petitioner benefitted from and controlled the funds in the Aldergrove account in 1991.

Although respondent's affirmative defense is broad in one respect, see supra note 5, respondent restrictively frames the issue that respondent seeks to preclude petitioners from relitigating. Since respondent directs our analysis of that affirmative defense to the facts relating to 1991 and also bears the burden of proving the applicability of the defense, we must assume that respondent does not seek to preclude petitioners from relitigating this Court's findings in Monahan I regarding petitioner's relationship with Aldergrove and other entities prior to 1991 (the pre-1991 issues).

### (2) The Authority of This Court To Raise Issue Preclusion Sua Sponte

Issue preclusion is an affirmative defense that must be pleaded, Rule 39, otherwise, it is deemed to be waived. See, e.g., Jefferson v. Commissioner, 50 T.C. 963, 966-967 (1968). Whether a party is precluded from relitigating an issue requires particularized analysis, and, thus, respondent must be deemed to have waived the defense of issue preclusion with respect to the pre-1991 issues even though respondent has properly raised that defense with respect to the Aldergrove issue. This Court, however, need not always accept waivers of the defense of issue

preclusion.  This Court may raise the doctrine of issue preclusion sua sponte.  Cf. Holloway Constr. Co. v. United States Dept. of Labor, 891 F.2d 1211, 1212 (6th Cir. 1989) (a district court may raise the doctrine of res judicata sua sponte); McClain v. Apodaca, 793 F.2d 1031, 1033 (9th Cir. 1986) (a bankruptcy court may raise the doctrine of res judicata sua sponte when it allowed the parties to submit posttrial briefs on the applicability of the doctrine); Alyeska Pipeline Serv. Co. v. United States, 231 Ct. Cl. 540, 688 F.2d 765, 771 (1982) ("when necessary, the court may raise the question of claim or issue preclusion sua sponte"); Fazi v. Commissioner, 105 T.C. 436, 444-445 (1995) (this Court may raise the doctrine of judicial estoppel sua sponte).  The purposes of the doctrine of issue preclusion include the conservation of judicial resources and the promotion of certainty in and reliance on judicial action.  See supra sec. II.C.3.b.  Courts have an independent interest in advancing those purposes, see United States v. Sioux Nation of Indians, 448 U.S. 371, 433 (1980) (Rehnquist, J., dissenting), and, therefore, respondent's, perhaps inadvertent, consent to relitigation of the pre-1991 issues cannot divest this Court of the authority to preclude petitioners from denying certain facts established after full and fair litigation in Monahan I.

Sua sponte consideration of issue preclusion generally should be limited to circumstances where the parties are given an opportunity to address the applicability of the doctrine to a particular issue.  See Nevada Employees Association, Inc. v. Keating, 903 F.2d 1223, 1225-1226 (9th Cir. 1990); McClain v. Apodaca, supra at 1033; see also Blonder-Tongue Labs., Inc. v. University of Ill. Found., 402 U.S. 313, 350 (1971) ("The purpose of * * * [requiring claim preclusion and issue preclusion to be pleaded] is to give the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate." (emphasis added)).  The Court need not subject the issue preclusion decision to the rigors of the adversarial process, however, if doing so would be futile.  Cf., e.g., McKinney v. Oklahoma Dept. of Human Servs., 925 F.2d 363, 365 (10th Cir. 1991) (District Court may sua sponte dismiss a complaint under Fed. R. Civ. P. 12(b)(6) without notice and an opportunity to respond when it is "patently obvious" that claimant could not prevail); Baker v. Director, U.S. Parole Commn., 916 F.2d 725, 726-727 (D.C. Cir. 1990) (same); Omar v. Sea-Land Serv., Inc., 813 F.2d 986, 991 (9th Cir. 1987) (where counterclaimant cannot possibly win relief because its theory was the same as its defense to a claim, which defense was rejected after a hearing, the trial court did not err in effectively

dismissing counterclaim without notice and an opportunity to oppose).  But cf. Cochran v. Morris, 73 F.3d 1310, 1320-1321, 1321 n.2 (4th Cir. 1996) (Michael, J., dissenting) (argues for an absolute prohibition against dismissals on the merits that are entered without notice and an opportunity to respond).

### (3)  Application of Issue Preclusion Sua Sponte

This Court has been apprised of the decision in Monahan I and finds it appropriate to consider sua sponte the preclusive effect of facts established in that proceeding, which facts are relevant to an issue in dispute in this case; i.e., whether Mr. Bell was the ultimate source of the funds loaned to Chestnut Grove and Group M.  Petitioners are precluded from denying that, on February 26, 1987, and December 22, 1988 (as will be explained below, the dates on which Aldergrove received certain "interest" payments), petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds held by Aldergrove (the sua sponte issues).[6]  All five conditions of the Peck requirements, see supra sec. II.C.3.b., are satisfied with respect to the sua sponte issues, and, therefore, issue

---

[6]    This Court sua sponte could preclude petitioners from denying certain facts established in Monahan I relating to petitioner's transfer of $125,000 to Aldergrove on Feb. 25, 1988, and subsequent transfers, but for convenience we shall examine facts relating to certain interest payments made in 1987 and 1988.

preclusion applies.  In addition, we believe that allowing petitioners to examine and contest the application of issue preclusion with respect to the sua sponte issues would be futile. This Court's official file in Monahan I was admitted as evidence for the purpose of deciding whether petitioners are precluded from relitigating the Aldergrove issue, and posttrial briefs were submitted by the parties to present their respective arguments. The only difference between the Aldergrove issue and the sua sponte issues is the date with respect to which this Court in Monahan I examined petitioner's relationship with Aldergrove. Under these circumstances, petitioners could add nothing to our analysis of the sua sponte issues and, therefore, are not prejudiced by the absence of notice and an opportunity to respond.

In Monahan I, this Court, among other things, sustained respondent's disallowance of certain interest deductions claimed by petitioners for 1987 and 1988.  Petitioners reported those deductions as mortgage interest payments on an alleged loan of $150,000 from Hansa Finance made in 1986.  After concessions, petitioners argued that they were entitled to deduct a portion of the interest payments as personal interest under section 163(h), and respondent argued that the loan and the interest payments lacked economic substance.

This Court found the following facts:  (1) "the ultimate source and resting place for the $150,000 was Aldergrove", (2) the interest payments made by petitioners on February 26, 1987, and December 22, 1988, on the purported loan were immediately transferred to Aldergrove, and (3) those payments lacked economic substance because petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds held by Aldergrove when the payments were made.  We stated:

> We find that these various payments by petitioners lacked economic substance.  Petitioner testified that the "mortgage" on his home was part of his asset protection plan, and that by reducing his equity in his home, he hoped to replace an "unknown liability that could take the house away" with a "known liability that you know you can repay," i.e., the "loan" note.  Petitioner neglected to complete the picture in his testimony however.  For any real protection to occur, petitioners would have also had to transfer the equity, or loan amount to a place unreachable by "unknown" creditors.  From our analysis of the above transactions, it appears that petitioners did just that by transferring equity through Hansa Finance (or Ihatsu Fudosan) to Aldergrove.  This fits squarely into petitioner's own testimony, since petitioner believed that assets held in Aldergrove were protected.  Of course, petitioner had to have access and control over Aldergrove's assets to make the plan truly beneficial to him.  He did, through his security interest in GML's Aldergrove capital and profits, and through his SAR's in GML.  Thus, the purported loan amount was never outside of petitioner's dominion and control and the principal and interest payments made by petitioners were nothing more than transfers from one beneficially owned account to another.  * * *  [Monahan I; fn. ref. omitted.]

As a preliminary matter, conditions (2) and (3) of the Peck requirements are satisfied, and petitioners reasonably could not have argued to the contrary. See supra sec. II.C.4.a. The sua sponte issues are identical in all respects to factual issues that were decided in Monahan I.[7] The Court in Monahan I examined petitioner's relationship with Aldergrove, the same partnership in issue in this case, on February 26, 1987, and December 22, 1988, and determined that, on those dates, certain interest payments made to Aldergrove lacked economic substance because petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds held by Aldergrove. In addition, the sua sponte issues were actually litigated in Monahan I, and resolution of those issues was essential to the decision in Monahan I that the interest payments made in 1987 and 1988 were not deductible. Therefore, conditions (1) and (4) of the Peck requirements are satisfied with respect to the sua sponte issues, and we believe that nothing petitioners could have presented would change our conclusion. Lastly, condition (5) of the Peck requirements is satisfied; any potential argument relating to a change in the applicable legal rules would not be tenable, and any potential argument relating to a change in the

---

[7] That condition of the Peck requirements is, in fact, satisfied because those factual issues decided in Monahan I are relevant to the 1991 interest issue.

controlling facts would be dismissed in the same manner that similar contentions of petitioners regarding the Aldergrove issue were dismissed, see supra sec. II.C.4.c.

In conclusion, petitioners are precluded from denying that, on February 26, 1987, and December 22, 1988, petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds held by Aldergrove.

### f.  Are the 1991 Interest Payments Taxable to Petitioners?

Promissory notes in evidence indicate that petitioner loaned the following amounts to Chestnut Grove and Group M, and we so find:

| Date | Maker | Amount |
|------|-------|--------|
| March 1, 1987 | Chestnut Grove | $23,382 |
| March 1, 1987 | Group M | 176,618 |
| March 1, 1988 | Group M | 110,000 |
| January 19, 1989 | Group M | 200,000 |

Petitioners present numerous documents and other evidence to explain the fate of the first three of those notes and to support their assertion that the Yakima interest payments represent interest paid to Mr. Bell.  The findings, however, that, on February 26, 1987, and December 22, 1988, petitioner controlled Aldergrove partnership matters and benefited from and controlled

the funds held by Aldergrove, in conjunction with petitioners' concession that Aldergrove was the source of the funds allegedly loaned to petitioner by Hansa Finance, $200,000 ($23,382 + $176,618) on March 1, 1987, and $110,000 on March 1, 1988, cast doubt on petitioners' version of the loan transactions.

A reasonable inference to be drawn from the sua sponte issues is that petitioner's relationship with Aldergrove did not change between February 26, 1987, and December 22, 1988, which would mean that petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds held by Aldergrove when Aldergrove likely transferred to Hansa Finance the funds that were loaned back to petitioner. Therefore, petitioners would have us believe that petitioner (1) in substance, transferred funds to Hansa Finance, (2) borrowed those funds back from Hansa Finance, (3) made loans with those funds to Chestnut Grove and Group M, (4) removed himself from the loan transactions by means of certain agreements, (5) received interest payments from Chestnut Grove and Group M by means of his relationship with Aldergrove on December 26, 1991, but (6) held the interest in trust for Mr. Bell because Mr. Bell was the ultimate source of the funds loaned to Chestnut Grove and Group M.

We simply do not believe petitioners' paper trail of promissory notes, deeds of trust, assignment agreements, and assumption of liabilities agreements tells the whole story because the funds that were loaned to Chestnut Grove and Group M in 1987 and 1988 <u>previously</u> traveled a circuitous route, which begins and ends with petitioner, in direct contradiction to petitioners' assertion that Mr. Bell was the ultimate source of those funds.  In sum, we have considered all of the evidence presented by petitioners, but, because the Yakima interest payments were credited to the Aldergrove account on December 26, 1991, and, on that date, petitioner controlled Aldergrove partnership matters and benefited from and controlled the funds in the Aldergrove account, we are not persuaded that the Yakima interest payments represent anything other than interest paid to petitioner on account of loans made by petitioner.

D.  <u>Conclusion</u>

We hold that the 1991 interest payments are taxable to petitioners.

III.  <u>$25,000 Deposit</u>

A.  <u>Introduction</u>

In the notice of deficiency, respondent determined that $317,160 was deposited in bank accounts held in the name of petitioners during 1991 and that those deposits were unexplained.

Respondent increased petitioners' taxable income accordingly. After concessions by respondent, a single $25,000 deposit remains in dispute. The issue is whether that deposit is taxable to petitioners.

B. Analysis

On December 26, 1991, petitioner transferred $25,000 from an account held by Group M at SP Bank to an account held by petitioners at the same bank (the payment). Petitioners, citing Ingalls v. Patterson, 158 F. Supp. 627, 641-642 (N.D. Ala. 1958), argue that the payment "represents a reimbursement of legal fees paid by Petitioner on behalf of Group M Construction so that the reimbursement is not income to Petitioner." Respondent argues that petitioners have failed to substantiate their explanation of the payment. The parties' presentation of the issue with respect to the $25,000 deposit requires this Court to examine only the facts relating to the payment. Respondent does not contest the legal basis upon which petitioners exclude that payment from their income for 1991.

Timothy Monahan testified that, although petitioner did not present any documents to Group M demonstrating the amount of the legal expenses to be reimbursed, he was convinced that petitioner spent at least $25,000 and, thus, authorized the payment. At trial, petitioner stated that he did not remember the exact

amount paid for legal expenses on behalf of Group M, but stated that the amount was substantially more than $25,000.  There are no documents in evidence that substantiate petitioners' claim that petitioner incurred legal expenses on behalf of Group M. Petitioners contend that the testimony of petitioner and his brother "was straight forward and credible."  We disagree.  The self-serving testimony of petitioner, vaguely corroborated only by the testimony of his brother, does not persuade us that the payment represents reimbursement of legal fees paid by petitioner on behalf of Group M.  Cf. Day v. Commissioner, 975 F.2d 534, 538 (8th Cir. 1992) ("The Tax Court is not required to give credence to the self-serving testimony of interested parties."), affg. in part and revg. in part T.C. Memo. 1991-140; Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971) (this Court did not err when it found that taxpayer's uncontradicted testimony plus the testimony of her accountant, both unsubstantiated by any documentary evidence, did not carry the burden of proof), affg. T.C. Memo. 1969-159.  Petitioners have failed to carry their burden of proof.  Therefore, we conclude that the $25,000 deposit is taxable to petitioners.

IV.  Penalty

Section 6662(a) provides for an accuracy-related penalty in the amount equal to 20 percent of the portion of an underpayment

of tax attributable to, among other things, any substantial understatement of income tax. Sec. 6662(a), (b)(2). In the notice of deficiency, respondent determined that the entire underpayment of tax for the 1991 taxable year was due to a substantial understatement of income tax. Petitioners bear the burden of proving that respondent's determination is erroneous. See Rule 142(a). In their briefs, petitioners simply assert that there is no substantial understatement of income tax. On the record before us, we find that respondent's determination of a penalty under section 6662(a) is correct, except to the extent that it relates to respondent's concessions regarding the unexplained bank deposits discussed in supra section III.A.

V. Conclusion

Respondent's determinations of a deficiency in and penalty on petitioners' Federal income tax for the 1991 taxable year are sustained to the extent set forth in this report.

Decision will be entered

under Rule 155.